498 P.2d 536

B. W. BURNS et al., Appellants,

v.

G. R. HERBERGER et al., Appellees.

No. 1 CA–CIV 1618.

Court of Appeals of Arizona,
Division 1,
Department B.

June 29, 1972.

Rehearing Denied July 26, 1972.

Review Denied Sept. 26, 1972.

**464**

Beer & Kalyna, by Olgerd W. Kalyna, Phoenix, for appellant Maricopa County.

Gary K. Nelson, Atty. Gen., by James D. Winter, Asst. Atty. Gen., Phoenix, for appellant State of Arizona.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Lyons, Phoenix, for appellees.

JACOBSON, Judge.

This appeal questions the valuation practices for *ad valorem* tax purposes of the Department of Property Valuation and the Maricopa County Assessor.

Plaintiffs-appellees, G. R. Herberger, Katherine Kierland Herberger, Herberger Enterprises, Inc., Scottsdale Ranches, Inc., and Central Arizona Development Co., Inc. (hereinafter collectively referred to as Herberger), are the owners of various parcels of unimproved real property situated in Maricopa County, Arizona. During the tax years 1968 and 1969, the taxing authorities of the State of Arizona and Maricopa County placed various valuations on these parcels for tax purposes. Herberger, being dissatisfied with the valuations placed on the properties, sought administrative relief, paid his taxes under protest, and subsequently brought suit in superior court against the taxing and collecting agents of the state and county, seeking a refund of the taxes paid for these two years. This action was based by Herberger upon the proposition that he was forced to bear a discriminatory and unfair tax burden, because the taxing authorities improperly and without statutory authority classified and appraised the Herberger properties erroneously.

The Herberger properties consist of three parcels referred to as the "Section Ten Property", the "Burson Property", and the "Shea Property". The trial court found that the manner of assessment of the Shea property for the year 1968 and 1969 was proper and denied relief to Herberger on this property. Herberger has perfected a cross appeal as to this ruling. As to the Section Ten property, the trial court found that the manner of assessment for the taxing years in question was discriminatory and illegal and ordered the refund of taxes paid on the assessed valuation of the property in excess of $7 per acre. Appellants have sought a review of this ruling. In regard to the Burson property, the trial court did not rule on the constitutionality of the assessment, but found that the purported increase in valuation made by the county assessor for the year 1969 was procedurally invalid and therefore ordered a refund of taxes paid on the assessment in excess of that set in 1968. Appellants have also sought review of this ruling.

Since substantially different legal problems are presented by all three of these properties, they will be discussed separately.

## SECTION TEN PROPERTY

The Section Ten property, consisting of 640 acres, is located approximately four miles east of Scottsdale Road and approximately five miles southeast of Carefree, Arizona. The property is relatively inaccessible and is completely surrounded by patented and federal and state lease land known as the DC Ranch. The DC Ranch, consisting of approximately 30 sections of

contiguous land, has historically been used as a ranching unit. During 1969, an attempt was made to raise the assessed value of the DC Ranch to $275 per acre, but on appeal, the Board of State Property Tax Appeals, reinstated the $7 per acre assessed valuation figure. It is agreed by all parties that the topography and physical characteristics of the adjacent DC Ranch property and the Section Ten property are substantially the same.

The Section Ten property was initially purchased by Herberger in 1954 at $50 per acre. Herberger had no opinion as to the value of the property at the time of trial. However, an MAI appraiser, employed by the state, was of the opinion that the property had a present fair market value of $500 per acre. There was no other evidence of valuation for this property before the trial court.

Following its acquisition by Herberger, this property had been leased for grazing purposes. However, it was undisputed that since 1965 no cattle or sheep had actually been physically present on the property or had the property been leased. This section has a carrying capacity of only four animal units per section per year. (Carrying capacity is determined by the amount of feed available to support a grazing animal.) Based upon the agricultural manual promulgated by the Department of Property Valuation, the taxing authorities determined that the Section Ten property did not qualify as agricultural-grazing land, and therefore designated it as desert land with an assessed value of $275 per acre.

As previously indicated, the court reduced the assessed valuation of this property to $7 per acre, which is comparable with the surrounding DC Ranch property valuation. Herberger's proof in support of this ruling was primarily limited to a showing of the similarity of the Section Ten property, both in use and physical characteristics, to the DC Ranch and arguing therefrom that both properties should be assessed at the same rate. The state on the other hand contends that based upon

the difference in use of the DC Ranch property and the Section Ten property, the difference in valuation was justified by the appropriate statutory enactment. In support of this difference in use, the state points out that the DC Ranch has been an operating ranch since 1912 and while the ranching operation does not utilize each and every part of the property every year, there were animals on the DC Ranch for the years 1967, 1968, and 1969 as verified by shipping tickets. The ranch is completely fenced or has natural barriers vitiating the need for fences; contains forest permit land; has watering capacity; and has been used almost exclusively for sheep grazing for the last four or five years. In contrast to this use, the Section Ten property has carried no livestock since 1965 and, having a carrying capacity of only four animals, it could not be economically operated as a ranch.

To determine whether the differences pointed out by the taxing authorities have validity under Arizona's present statutory scheme of classification and valuation of real property for tax purposes, it is necessary to review that scheme in the light of legislative revisions resulting from the decision in Southern Pacific Co. v. Cochise County, 92 Ariz. 395, 377 P.2d 770 (1963).

Prior to the *Southern Pacific* case, the taxing statutes required that all real property in the state should be assessed at its "full cash value". A.R.S. § 42–227. "Full cash value" was defined by former A.R.S. § 42–201, subsec. 1 (since repealed) as "the price at which property would sell if voluntarily offered for sale by the owner upon such terms as property is usually sold, and not the price which might be realized if the property were sold at forced sale."

This statutory definition is closely related to what is generally referred to as "fair market value". *See* State v. McDonald, 88 Ariz. 1, 352 P.2d 343 (1960).

The various county assessors of this state had traditionally ignored this legislative mandate and based valuation upon

various self-made classifications, the end result of which was a discriminatory and arbitrary taxing system which was rightfully struck down in the *Southern Pacific* case. (Decided January 9, 1963.)

This decision forced the legislature to immediately take steps to revise Arizona's taxing structure by establishing a State Division of Appraisal and Assessment Standards (later redesignated as the Department of Property Valuation) and establishing classifications of property. *See* Chapter 43, 1963 Session Laws Arizona (effective March 27, 1963). This legislation envisioned a complete revaluation of all real property in the state, which revaluation would be based upon the prior statutory definition of "full cash value". Thus the 1963 legislation sought to cure the lack of classification ills present in the prior legislation without reference to what might result from using the "full cash value" definition in this new structure.[1] The legislation referred to in the footnote required the director to complete the appraisal of all *ad valorem* tax property in the state by February 1, 1966. The director complied with this legislative directive basing the valuation of the property at "full cash value" and in essence ignored the "current usage" of the property.

We pause at this point to briefly discuss what is "full cash value", or "fair market value". The only true test of "fair market value" is to look, after the fact, at what a particular piece of property actually sold for, and then, only under certain conditions. Any other definition of "fair market value" is merely an opinion of a person schooled or experienced in appraisal techniques as to what a particular piece of property *might* sell for at the particular time in question. In arriving at this opinion, standard appraisal methods and techniques utilize basically three criteria: (1) the replacement method, a value arrived at

by the use of current cost of reproducing the property less appreciation and depreciation from all sources; (2) the income approach method—a value arrived at by determining the property's net earning power based upon the capitalization of that net income; and (3) market data method —a value determined from recent sales of comparable properties in the market. *See* Navajo County v. Four Corners Pipe Line Company, 106 Ariz. 511, 479 P.2d 174 (1970); State Public Works Board v. Stevenson, 5 Cal.App.3d 60, 84 Cal.Rptr. 742 (1970). This so-called "appraisal trinity" was employed by the director in the revaluation submitted in 1966, which resulted in valuing property at its "fair market value". Superimposed upon this determination of valuation was the requirement that the appraisal be based upon the "highest and best use" of the property. *See* County of Maricopa v. Paysnoe, 83 Ariz. 236, 319 P.2d 995 (1957).

When the results of this new valuation were made public, the hue and cry, especially from the agricultural, livestock, and small homeowner interests of this state was loud and vociferous. The reason for the outcry was obvious. Agricultural pursuits in this state and in the country in general, had traditionally received a lower income return of their investment than other business ventures. Thus, while business in general has obtained a return of eight percent to ten percent on its investment, agriculture has brought a return of one percent to two percent.

To then value agricultural land which may in fact have as its "highest and best use" a non-agricultural commercial use, at a fair market value based upon the market data derived from sales of other non-agricultural commercial property could result in a confiscatory tax because of the low profit margin traditional to this type of land. The same is true of the small home-

---

1. In fairness to the legislature it should be pointed out that in 1964, the director of property valuations was directed "[i]n establishing a manual for assessment purposes, *current usage* shall be included in the formula for reaching a determination of full cash value." Chapter 89, Session Laws of Arizona, 1964. (Emphasis added.)

owners who reside in an area gradually shifting from a residential to a commercial character. The commercial lot next door to a residence has a use value greatly in excess of the use value of that same lot for residential purposes. To fix fair market value of residence property, whose "highest and best use" is commercial, upon a valuation for commercial purposes would also be confiscatory.

The Arizona *ad valorem* tax situation was in this posture, when a special session of the legislature was called in 1967 to deal with taxation problems. The legislation resulting from that special session is what is before us in this case.

A.R.S. §§ 42–123 and 42–201 were amended to provide as follows:

A.R.S. § 42–123, subsec. A (5) states that the Director of Property Valuation shall:

"Adopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation thereof. In the standard appraisal methods and techniques adopted *current usage shall be included in the formula for reaching a determination of full cash value* and when the methods and techniques adopted prescribe the use of market data as an indication of market value, the price paid for future anticipated property value increments shall be excluded." (Emphasis added.)

A.R.S. § 42–201, subsec. 4 states:

" 'Current usage' means the use to which property is put at the time of valuation by the assessor or the department."

A.R.S. § 42–201, subsec. 7 states:

" 'Full cash value' for property tax purposes is synonymous with market value which means that estimate of value

that is derived annually by the use of standard appraisal methods and techniques."

From our review of the past taxation history and the setting in which this legislation was enacted, we are of the opinion that this legislation had the effect of redefining "full cash value" so that the Department of Property Valuation would have specific directions as to the fundamental principles to be applied in making appraisals. Under these principles, all property subject to *ad valorem* taxation was to be appraised at its fair market value, considering not its "highest and best use", but the current usage to which it was being placed. To not recognize this consideration is to ignore the legislative mandate that "current usage shall be included in the formula for reaching a determination of full cash value," (A.R.S. § 42–123), subsec. A (5)) and to reinstate the "highest or best use" concept previously inherent in determining fair market value.

In fulfillment of the direction given to the director to prepare manuals and guidelines, he established guidelines defining agricultural-grazing property as follows:

"1. used for purposes of . . . animal husbandry.

"2. in which the primary function is to produce an agricultural crop or commodity.

"3. used with the reasonable expectation of profit solely from its agricultural use.

"4. in which the primary investment is for the purpose of . . . stock ranching."

Herberger first attacks the validity of the establishment of this agricultural guideline by the director as an unconstitutional delegation of power and hence argues that such guidelines cannot be used to classify the Section Ten property as non-grazing land.

A statute does not unconstitutionally delegate legislative power if it contains reasonably definite standards which

govern the exercise of that power. Schecter v. Killingsworth, 93 Ariz. 273, 380 P.2d 136 (1963). The standards which govern the exercise of that power need not be expressed in the delegating statute itself, if they can be reasonably ascertained from the statutory scheme as a whole. State v. Arizona Mines Supply Co., 107 Ariz. 199, 484 P.2d 619 (1971).

A.R.S. § 42–123, subsec. A (5) granted the director power to "prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation thereof." Such a grant required that the director not only establish guidelines for valuation by using the standard appraisal trinity, as modified by current usage, it also required that he establish guidelines for determining an "inventory" of property, that is the class of property within the state. If nothing further was mentioned in the statutory scheme as to the classes of property, it may well be that there would be an improper delegation of legislative authority. However, the statutory scheme went further and by A. R.S. § 42–136, the legislature did in fact classify property for taxation purposes, including "[a]ll real property and the improvements, thereto, if any, used for agricultural purposes" (A.R.S. § 42–136, subsec. 4 (a)), thus avoiding the improper delegation of legislative authority struck down in Southern Pacific Co. v. Cochise County, *supra*.

■ "Agricultural purposes" has, in our opinion, a sufficiently well-defined meaning so as to establish a reasonable legislative standard by which the director could prepare guidelines for defining land used for that purpose. *See* State v. Tiffany, 44 Wash. 602, 87 P. 932 (1906). We therefore hold that the legislature in directing the Director to prepare guidelines defining agricultural use did not improperly delegate its legislative authority and therefore such guidelines are valid.

This then brings us to the basic contention of Herberger insofar as the Section Ten property is concerned, that is, that the taxing authorities in applying a market data approach in valuating the Section Ten property and a use approach to the surrounding DC Ranch property indulged in a gross discriminatory practice which resulted in a constructive fraud of the taxpayer and destroyed uniformity and equality in fixing assessed valuation in contravention of the Constitution of Arizona, Article IX, Section 1, A.R.S.

There is no doubt that this constitutional provision requires that "[a]ll taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax." There is also no doubt that the Section Ten land and the DC Ranch land are of the same "class" insofar as their physical characteristics and topography are concerned. However, are these lands of the same "class" insofar as usage is concerned?

■ That the legislature can constitutionally classify property for tax purposes based upon the use to which the property is put is well established. Apache County v. Atchison, Topeka & Santa Fe Ry. Co., 106 Ariz. 356, 476 P.2d 657 (1970).

■ Applying the above determined statutory interpretation of our taxing laws, and having established that the agricultural guidelines as promulgated by the director are valid, does the Section Ten land and the DC Ranch property qualify as agricultural land under that definition? The answer so far as the Section Ten property is concerned is no, it does not so qualify; as to the DC Ranch property, yes, it does qualify. The DC Ranch is an operating ranch used as such when rainfall permits; the Section Ten property is not. The DC Ranch comprises numerous sections of land and is capable of being economically operated as a ranch; the Section Ten land is capable of supporting only four animal units which would be uneconomical for operation as a ranching unit. The DC Ranch has historically been used for grazing live-

stock; the Section Ten property has not. The DC Ranch has an income history upon which a valuation may be based; the Section Ten land has no such history. The Section Ten land is held for speculative purposes without expectation of current income; the DC Ranch is not so held. Since the two properties, although alike in physical characteristics, are in fact different in the use to which they are put, the taxing authorities of this state, under the statutory scheme of classification and determination of "full cash value" previously outlined, was justified in using different methods of appraisal as to each. These taxing authorities properly concluded that in applying the legislative direction of "current usage" to the DC Ranch, the method of valuation could be determined by applying the capitalization of income techniques, a standard appraisal method. On the other hand, the Section Ten property not properly falling within the agricultural guidelines, and having no income generated by its use, the taxing authorities properly applied, in our opinion, the market data approach in valuing that land for tax purposes, also a standard appraisal technique.

It should also be pointed out that the Department of Property Valuation has applied the same grazing land valuation throughout the state, including lands owned by Herberger in other parts of the state. Likewise, other desert, non-income producing, non-agricultural land, in the state has been valued by the same method used to evaluate Herberger's Section Ten land. In other words, there is simply no evidence that Herberger has been systematically singled out for different tax treatment than that accorded all other like properties, considering usage, in the state.

■■ One additional point must be mentioned in connection with the Arizona definition of "full cash value" and that is the requirement that in reaching this valuation when the market data method of appraisal is utilized, "the price paid for future anticipated property value increments shall be excluded." A.R.S. § 42–123, subsec. A (5). It is thus apparent that the legislature intended that appraisals for *ad valorem* tax purposes based upon market data be different from appraisals generally used by the business community and the courts in dealing with the condemnation, probate and other valuations. What this limitation on the use of market data means can best be illustrated by the profit motive in real estate investment.

■■ If an investor purchases a parcel of property and immediately receives a return on his investment consistent with the capitalization rate common in the market place, he has probably not anticipated a future increment in value on his investment. However, if this same investor purchases a parcel of land and receives a small return in comparison to the general market place, or no return at all, he must be anticipating an increase in value to that land which is greater than may be generally attributed to other property. It is this portion of the purchase price paid which represents the anticipated increase in value which must be excluded by A.R.S. § 42–123 from the valuation for tax purposes when comparative market data sales are utilized. The "Inwood Tables", used by the Department of Property Valuation, permit the present-day valuation of property, based upon sales data which reflect future use. The use of such tables which exclude future anticipated value are a standard procedure in the appraisal field. Thus, while the Section Ten land has a market valuation of $500 per acre, for *ad valorem* tax purposes it was valued at $275 per acre. The method used for such valuation was statutorily proper and in keeping with the exclusion of future anticipated property value increments.

We therefore hold that the valuation of the Section Ten property by the taxing authorities was proper and the trial court was in error in reducing that valuation from $275 per acre to $7 per acre. The judgment of the trial court in this regard is reversed.

## BURSON PROPERTY

The trial court never reached the merits of the valuation of the Burson property, a parcel containing approximately 3500 acres, concluding on procedural grounds that the attempted revaluation of this property from $7 per acre to approximately $275 per acre for 1969 was invalid.

A stipulation at trial established that in 1968, the then county assessor placed the Burson property on the tax rolls at $695 per acre. However, after consultation with Herberger's attorney, it was agreed that the valuation should be reduced to $7 per acre. This agreement took the form of a consent judgment entered in a superior court tax appeal. In 1969, the new assessor intended to restore the $695 per acre value originally placed on this parcel. This was accomplished on the appropriate records in the assessor's office. Apparently this tentative revaluation was brought to the attention of Herberger, who on April 11, 1969, filed a written protest. The assessor was persuaded that the Burson property values should be something less than $695 per acre—approximately $275 per acre. The assessor then notified the Department of Property Valuation on the appropriate Notice of Change forms of this new valuation during the latter part of April, 1969, and early part of May of the same year. The County Board of Equalization upheld this valuation. However, Herberger still not being satisfied with the valuation, filed an appeal with the Arizona Board of Property Tax Appeals. This board dismissed the appeal, stating:

> "[T]he *State Board rules* that the Maricopa County Assessor in increasing the valuation of the property which is the subject of this appeal after the date that permits the property owner to request a review of his property valuation, has taken action contrary to the interests of all property owners and contrary to the intent of the legislature in providing a fair avenue of appeal to all property owners." (Emphasis in original.)

The trial court, in effect, agreed with the State Board, holding that the cutoff date for changes by the assessor was April 1 of each year and changes made after that date without the prior approval of the director were ineffective to change valuations.

The assessor argued that the statutory cutoff date for changes made by him is May 20 of each year and the subject changes being made prior to that date were valid. On the other hand, Herberger argues that under the statutory scheme granting to the director of the Department of Property Valuation overall supervisory control of property valuation within this state, individual county assessors may not change property valuation on the rolls fixed as of December 31, 1967 or modified subsequent to that date by appropriate statutory procedures, without the prior approval of the director.

We are of the opinion that the trial court incorrectly upheld Herberger's contention in this regard.

As previously indicated, the extensive legislative revision made to the Arizona *ad valorem* tax structure in 1967 had as its aim the establishment of uniform taxing practices throughout the state and to correct the evils of individual county assessments revealed in Southern Pacific Co. v. Cochise County, *supra*. To this end, the director was mandated to correct and update all valuations of property in this state by December 31, 1967. A.R.S. § 42–127, subsec. B. In addition, A.R.S. § 42–127, subsec. B specifically provided that: "[s]uch corrected valuations shall thereafter be used as the valuation for such property *on the rolls,* subject to change as provided for in this title." (Emphasis added.)

To assure uniformity and to prohibit such valuation from being undone by individual county assessors without the approval of the director, the legislature provided by A.R.S. § 42–126, that:

> "The assessors and treasurers *shall not* make any change in the valuation or assessment of any property *listed on the*

*rolls* unless written notice of such change has been furnished to the department in accordance with the form prescribed by the director and the director has approved such change." (Emphasis added.)

The assessor, however, argues that the provisions of A.R.S. § 42–221, subsecs. B, D, and F allow him to set valuation of the property without the approval of the director and therefore he can be allowed to make changes in the valuation provided he does so prior to May 20, 1969 (the date he was to complete the tax roll, A.R.S. § 42–239),[2] and so notifies the department.

A.R.S. § 42–221, subsec. B provided, at the times pertinent here, that "[b]y April 1[3] each year the county assessor shall ascertain by diligent inquiry and examination all property in his county subject to taxation, and . . . determine through the use of the manuals furnished and procedures prescribed by the department the full cash value of all such property and he shall list such property together with the valuation found *for use on the roll.*" (Emphasis added.) In the event the valuation *to be used on the roll* is protested by the taxpayer and the assessor agrees, Subsection D of A.R.S. § 42–221 provides:

"If the assessor finds any particular in the matter complained of to be erroneous, the assessor shall submit the necessary correction to the department for approval prior to May 1." [4]

A.R.S. § 42–221, subsec. F further provided that:

"The assessor shall rule on every petition filed under this section within twenty days after the filing thereof, but in no event later than May 20." [5]

In our opinion, the thread running through this entire tax valuation structure is that the end result of all the valuation work, that is, the placing of the property on the tax rolls together with its valuation, will not be left to the whim or caprice of an individual assessor or local board of supervisors. Therefore, A.R.S. § 42–126 provided that changes in the *tax roll* shall not be made without approval of the director of the Department of Property Valuation. However, the legislature, realizing that use of property and improvements thereon do not remain static and that oversights in property valuation may occur, authorized the assessor by A.R.S. § 42–221 to make diligent inquiry into these changes and oversights and to make initial tentative valuation of these properties "for use on the roll." Safeguards to the taxpayer were built into this initial valuation setup to assure that when the tax roll was actually completed and the taxpayer's basis of liability was set, he had an adequate opportunity to protest and appeal this initial valuation. (*See* A.R.S. § 42–221 et seq.)

 This was the procedure followed by the assessor in this case. The assessor determined the previous valuation of $7 per acre as reflected on the tax rolls for the Burson property was improper. He therefore revaluated the property "for use on the roll" for 1969 at $695 per acre. This tentative revaluation did not, however, have the immediate effect of changing the valuation on the tax rolls for the appropriate safeguards of the taxpayer had not yet expired. Consequently, under A.R.S. § 42–126 he was not required to notify the director of "any change in the valuation . . . of any property listed on the rolls" at that time. While the record is unclear as to when this tentative revaluation by the assessor was done, it was obviously completed in time for Herberger to exercise his right of protest under the statute, by April 15, 1969. A.R.S. § 42–221, subsec. D. Herberger availed himself of

---

2. This date has now been changed to April 20 (Session Laws Arizona 1969), Ch. 122, § 6.

3. This date has now been changed to January 1 (Session Laws Arizona 1969), Ch. 122 § 5.

4. This date has now been deleted and changed to "within fifteen days after filing the petition."

5. This date has now been deleted and changed to "within thirty days after the filing thereof."

this right and filed a protest on April 11, 1969. As a result of this protest, Herberger was partly successful in having the tentative revaluation reduced from $695 per acre to approximately $275 per acre. It was at this point that the assessor—Herberger having exhausted his remedy before him—finally determined that a change in the valuation of the Burson property on the tax rolls was in order and so notified the director as required by A.R.S. § 42–126. Under A.R.S. § 42–221, the assessor had until May 20, 1969 to make this notification, with which date he complied.

We, therefore, hold that the notification of change in the tax roll required by A.R.S. § 42–126 need not have been made by the assessor until the procedures and time limitations set forth in A.R.S. § 42—221 had been complied with, assuming, of course, that the assessor's initial proposed increase was made at such a time as not to prejudice the taxpayer's rights under A.R.S. § 42–221.[6] The trial court incorrectly determined that the assessor failed to follow statutory procedures in revaluating the Burson property and its judgment in this regard is reversed. Since the trial court did not reach the merits of whether the valuation of this property was constitutionally correct, and since this court will not second guess the trial court in this regard, this matter is remanded to the trial court for this determination in accordance with the principles previously set forth in this opinion as they deal with the Section Ten property.

## SHEA PROPERTY

The Shea property consists of approximately 296 acres of unimproved desert land situated at the northwest and southwest intersection of Shea Boulevard and Gilbert Road (136th Street). Evidence at trial indicated that property lying to the east of 136th Street had a valuation of approximately $90 per acre, while property lying west of 136th Street (which included the Herberger property) was valued at $695 per acre.

While Herberger contends that the property lying both east and west of 136th Street was similar in topography and use and that therefore his land was discriminatorily assessed, his basic attack on this valuation stems from the use of a "mass appraisal" technique in appraising his property. Our review of the evidence supports the trial court's determination that in fact the topography and values of land lying east of 136th Street is different from that lying west of 136th Street and therefore a valid distinction for valuation purposes is present and no unconstitutional discrimination results from applying this difference in valuation.

Turning to the validity of the mass appraisal argument, this technique, as utilized by the Department of Property Valuation, is a method by which large areas of land are given a valuation based upon market data as to what similar land will sell for without engaging in individual parcel by parcel appraisements. The department will, for example, determine from market data what desert land will generally sell for in a given area and reach an opinion as to the valuation of this type of land. This valuation, so determined, will then be applied to all similar desert land without making an individual, independent appraisal of the parcel on which the valuation is then assigned.

Herberger contends that the mass appraisal method is not a standard appraisal technique, and if it is a standard technique, its application results in discrimination. As to this last contention we need only reiterate our previous finding that the evidence does not support any discriminatory result insofar as the Shea properties are concerned and add that the evidence revealed that an actual appraisal of this property resulted in an opinion as to valuation in the sum of $1250 per acre as compared to the assessed valuation of $695 per acre to dispose of the same.

6. Our opinion in this regard is based upon the statutes as they existed prior to 1969 and no opinion is expressed under the current statutes.

As to the first contention, the evidence revealed that the mass appraisal technique was based upon a market data method of appraisal which, as previously pointed out, is one of the recognized appraisal trinity. Herberger has failed to cite to the court any case holding that a "mass appraisal" per se is invalid. Our independent research has also failed to expose any such case. We therefore hold that where the mass appraisal technique is based upon a standard appraisal procedure, and a resulting valuation thus derived bears a reasonable relationship to the actual full cash or market value, the burden rests on the taxpayer to show that such mass valuation when applied to his specific property results in an unjust or discriminatory valuation. This burden Herberger has failed to carry. As to the Shea property, the judgment of the trial court is affirmed.

For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part and the matter remanded to the trial court for further proceedings not inconsistent with this opinion.

HAIRE, C. J. Division 1, and EUBANK, J., concur.