599 P.2d 227

Lloyd W. GOLDER and Esther B. Golder, husband and wife, Cimarron Properties Company, a partnership, A. W. Gibson and Eunice Gibson, husband and wife, Transamerica Title Insurance Company, Trust No. 6596, Catalina Foothills Estates, Inc., an Arizona Corporation, Barrick W. Groom, John G. Payson and Patricia Payson, husband and wife, Robert Snowden, as Trustee, and John W. Murphey, Trustee, Appellants,

v.

DEPARTMENT OF REVENUE, STATE BOARD OF TAX APPEALS, successor in interest to the State Board of Property Tax Appeals, Pima County Board of Supervisors, Pima County Assessor and Pima County Treasurer, Appellees.

Nos. 2 CA–CIV 2552 to 2 CA–CIV 2560.

Court of Appeals of Arizona,
Division 2.

Jan. 24, 1978.

Rehearing Denied March 1, 1978.

Review Granted March 28, 1978.

Stubbs & Townsdin, P. C. by Charles L. Townsdin, Jr., and Robert C. Stubbs, Tucson, for appellants.

Beer, Layna & Simon, P. C. by Olgerd W. Kalyna and Donald P. Roelke, Phoenix, for appellees.

## OPINION

HOWARD, Judge.

This case involves the application of A.R.S. § 42–123(A)(5) which states:

"A. The department [of revenue] shall:

\* \* \* \* \* \*

5. Adopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation thereof. In the standard appraisal methods and techniques adopted current usage shall be included in the formula for reaching a determination of full cash value and *when the methods and techniques adopted prescribe the use of market data as an indication of market value, the price paid for future anticipated property value increments shall be excluded."* (Emphasis added)

Nine separate real property ad valorem tax appeals were instituted under the provisions of A.R.S. §§ 42–142, 42–151 and 42–152, all as amended, regarding the tax year 1975. They were consolidated for trial and have been consolidated for appeal. All of the properties, which were vacant, undeveloped, desert land, are located in an area known as the Catalina Foothills in Pima County.

Four thousand, three hundred acres are involved. The Murphey family interest (Snowden, Groom, John Murphey and Catalina Foothills, Estates, Inc.) involves approximately 1,970 acres. Approximately 1,450 acres were owned by Mr. Hvidsten (Transamerica Title Insurance Company, Trust No. 6596). The Cimarron property contained approximately 380 acres, the Gibson property consisted of approximately 307 acres, the Golder property was 150 acres and the John Payson property was comprised of 80 acres.

Prior to 1974, an analysis of the sales of suburban and rural land in Pima County had not been performed since 1968, when the land involved had been valued by the Department of Property Valuation.[1] The value of the subject properties was set at approximately $800 per acre.

In 1974, the Pima County Assessor undertook a revaluation of all rural and suburban lands within Pima County. As a result of this revaluation the assessor determined the valuations of the subject properties as of January 1, 1975 to be between $1,820 and $2,540 per acre.

---

1. Now the Department of Revenue, Division of Property and Special Taxes.

These valuations were appealed to the State Board of Tax Appeals. With the exception of the Cimarron and Golder properties, all the valuations were reduced by the State Board. These reductions averaged approximately 20%.

The sole issue on appeal to the superior court was whether or not the valuations were excessive. Appellants claim that the "full cash values" of the properties did not exceed a range of $73 to $441 per acre. The thrust of their position was that the assessing authorities had failed to exclude the "price paid for future anticipated property value increments" from the market value used to determine the valuations. With minor adjustments, the trial court agreed with the valuations set by the State Board.

Appellants present the following questions for review.

I "Did the trial court ignore the requirement of A.R.S. § 42–123(A)(5) and the *Burns v. Herberger* decision, thereby failing to reduce the full cash values of Appellants' properties?

II Did the trial court err in failing to grant Appellants' Motion to Strike Solot's appraisal inasmuch as he failed to appraise on a cash basis?

III Did the trial court err in failing to grant Appellants' Motion to Strike Solot's appraisal relating to the Hvidsten property on the grounds that he failed to value Hvidsten's property as one, large parcel?"

Appellant's main complaint is that the Department of Revenue has changed the rules of the game since it failed to follow the position it advocated and that was adopted by the court in *Burns v. Herberger*, 17 Ariz.App. 462, 498 P.2d 536 (1972). Appellants' valuation witnesses assiduously adhered to *Burns v. Herberger*, supra, and to a memorandum issued by Arlo Woolery in 1969 as director of the Department of Property Valuation. In *Burns v. Herberger*, supra, Division One of this court correctly recognized the effect of the legislature's redefinition of "full cash value":

"From our review of the past taxation history and the setting in which this leg-islation was enacted, we are of the opinion that this legislation had the effect of redefining 'full cash value' so that the Department of Property Valuation would have specific directions as to the fundamental principles to be applied in making appraisals. Under these principles, all property subject to *ad valorem* taxation was to be appraised at its fair market value, considering not its *'highest and best use' but the current usage to which it was being placed.* To not recognize this consideration is to ignore the legislative mandate that 'current usage shall be included in the formula for reaching a determination of full cash value.' (A.R.S. § 42–123, subsec. A(5)) and to reinstate the 'highest or best use' concept previously inherent in determining fair market value."

The Court in *Burns v. Herberger*, supra, went on to illustrate what was meant by the phrase "the price paid for future anticipated property value increments shall be excluded" which appears in A.R.S. § 42–123(A)(5):

"If an investor purchases a parcel of property and immediately receives a return on his investment consistent with the capitalization rate common in the market place, he has probably not anticipated a future increment in value on his investment. However, if this same investor purchases a parcel of land and receives a small return in comparison to the general market place, *or no return at all,* he must be anticipating an increase in value to that *land which is greater than may be generally attributed to other property.* It is this portion of the purchase price paid which represents the anticipated increase in value which must be excluded by A.R.S. § 42–123 from the valuation for tax purposes when comparative market data sales are utilized. The 'Inwood Tables', used by the Department of Property Valuation, permit the present-day valuation of property, based upon sales data which reflect future use. The use of such tables which exclude future anticipated value are a standard

procedure in the appraisal field. Thus, while the Section Ten land has a market valuation of $500 per acre, for *ad valorem* tax purposes it was valued at $275 per acre. The method used for such valuation was statutorily proper and in keeping with the exclusion of future anticipated property value increments." (Emphasis added)

At trial Mr. Woolery, who is no longer employed by the State of Arizona, testified that he had written the "Woolery Memorandum" shortly after he was appointed director of the Department of Property Valuation. At the time of his appointment, he had limited appraisal experience. As he became familiar with the appraisal process, he found that there were certain errors and fundamental weaknesses in his memorandum. He also determined that it was incorrect. One error was a reference to the use of "Inwood Tables". In short, it was his opinion as well as that of other State expert witnesses that none of the market data relied upon by them or the appellants contained any prices paid for future anticipated property value increments. These sales had occurred in an active market and it was their opinion that the parties to these transactions had only paid the present value of the benefits they were purchasing. Therefore, the market data did not include any price for future anticipated property value increments. It was their opinion that the current use of the subject properties was holding for investment and that this also happened to be their highest and best use on the valuation date.

It is appellants' contention that *Burns v. Herberger, supra,* must be followed and that if the property is not put to an immediate use, then, according to *Burns v. Herberger,* supra, the purchaser ". . . must be anticipating an increase in value to that land which is greater than may be generally attributed to other property." And, according to the court in *Burns v. Herberger,* supra, a portion of the purchase price must represent the anticipated increase in value which must be excluded by A.R.S. § 42–123 for the valuation for tax purposes when comparative market data sales are utilized.

■ The crucial issue is whether the trial court erred in accepting the testimony of the State's expert witnesses that the sales which they used reflected only the current use and did not contain any amounts paid for future anticipated property value increments. There is nothing which prevents the State from concluding that the appraisal methods used in the past were incorrect. We believe that the trial court was justified in accepting the testimony of the State's expert witnesses and in rejecting the rationale urged upon the court in *Burns v. Herberger,* supra. The basic fallacy contained in *Burns* is the assumption that because a person buys property and does not put it to immediate use, it necessarily follows that the purchase price contains an amount that is attributable to future anticipated property value increments. Behind this basic fallacy is the incorrect assumption that buying and holding property for investment purposes is not a "current use". We believe the *Burns* dicta is an erroneous interpretation of the statute, although the court in *Burns v. Herberger,* supra, was entirely correct in its conclusion that the purpose of the statute involved was to relate the ad valorem tax to current use as opposed to highest and best use.

■ What then does the language of A.R.S. § 42–123(A)(5) mean? Let us assume the following facts: A owns a farm near a rapidly developing urban area. Its "highest and best use" is for a residential subdivision, however, A is currently farming the land. The county assessor is going to determine its fair market value and decides that the market data approach should be used in this determination. There are several sales of farm land in the area. His analysis of these sales shows that when the sale is of the land for use as a farm, the land in the area sells typically for $250 per acre. But there have also been sales to speculators and investors who are contemplating the use of the farm land as a subdivision and not as a farm and the price has been $1,000 per acre. In arriving at the fair market value of A's farm the assessor

cannot assign a value of $1,000 per acre based upon the sales to the investors and speculators because the market shows the price of $1,000 per acre includes future anticipated property value increments which cannot be realized until the current use, i. e., farming, is discontinued.

We conclude that the trial court did not err in following the testimony of the State's expert witnesses rather than those of the appellants.

Mr. Sanders Solot, an appraisal witness for the appellee, testified that in forming his opinion as to the market value of the property he made no effort to value the property on a cash basis. Appellants moved to strike his valuation testimony on the basis that he had failed to find the actual cash value of the property. A.R.S. § 42–201(4) provides:

> " 'Full cash value' for property tax purposes is synonymous with market value which means that estimate of value that is derived annually by the use of standard appraisal methods and techniques."

We have held that the term "market value" in determining the value of property for the purpose of ad valorem taxes means the highest price estimated in terms of *money* which the property will bring if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which it is adapted and for which it is capable of being used. *Department of Revenue v. Transamerica Title Insurance Company*, 117 Ariz. 26, 570 P.2d 797 (App. 1977). Market value imports a sale for cash and not on terms. It is the duty of the assessor to value the property and not value the creditor or the terms of a sale which may be subject to many variables. As was stated by the court in *State v. Woodward*, 208 Ala. 31, 93 So. 826 (1922):

> "We can find no good reason for imputing to the words 'cash value,' as used in the present statutes, a meaning which is opposed to the common as well as the judicial understanding of them. That they import value in money presently paid we cannot doubt; and it may be observed that if such was the legislative intention in the ascertainment of 'the fair market or real value' of property for tax assessment, as declared in *State v. Bienville, etc., Co.*, [*State v. Bienville Water Supply Co.*, 89 Ala. 325, 8 So. 54] supra, that intention is surely not changed by the substitution of the words 'fair and reasonable cash value,' which aptly and directly express the meaning formally imputed by interpretation only.

> Undoubtedly, a sale on credit would, as observed in *Mahone v. Williams*, 39 Ala. 202, 215, have a tendency 'to increase the number of bidders and to enhance the price.' And that enhancement would vary ad infinitum according to the minitude of the cash payment and the magnitude and duration of the credit. If a property like either of these could be bought for a cash payment of $1,000, for example, the balance of $999,000 to be paid in 20 years, a speculative element would be injected into its valuation, and the price obtainable on such liberal terms would be unduly swollen.

> In our opinion, it is the purpose of the law to establish a simple and stable criterion for the valuation of property for taxation, and that in requiring assessments to be made on the basis of a 'fair and reasonable cash value' it was intended to exclude the uncertainty and injustice of valuations based on credit. . . ." 93 So. at 827.

We conclude the trial court erred in not striking the valuation testimony of Mr. Solot.

Appellants complain that Mr. Solot in his appraisal of the Hvidsten property used an improper appraisal method when he did not value it as a whole, but rather as three separate parcels.

A.R.S. § 42–229, as amended, states:

> "If two or more contiguous lots, tracts of land or patented mines are owned by the same person, they *may* be jointly assessed and one valuation fixed for the whole." (Emphasis added)

Mr. Solot testified that if he had valued the Hvidsten property as a whole, his valuation

would have been lower but no monetary amount was mentioned. Appellants claim that the use of the word "may" is mandatory rather than discretionary.

In determining whether the word "may" as used in the act under consideration is permissive or mandatory, if it cannot be gathered from the language used therein, the court must look to the words, context, subject matter, effects and consequences as well as to the spirit and purpose of the law. *Frye v. South Phoenix Volunteer Fire Company,* 71 Ariz. 163, 224 P.2d 651 (1950).

The record here supports the general proposition that, all things being equal, smaller parcels sell for a higher price per unit than do larger parcels. The rationale behind this proposition is that there are more purchasers who can afford to pay the price for the smaller parcel than for the larger parcels. However, this general proposition is not always true. For instance, in this case, three parts of the property ranging from 237 to 640 acres sold for $2,350 to $3,250 per acre while smaller parcels 24 to 153 acres sold for $1,225 to $2,000 per acre.

We believe the purpose of the statute is to aid the assessor in his computation of fair market value. To that end, he may fix one valuation for the whole if in so doing, he will more accurately reflect the actions of the market. Here, Mr. Hvidsten divided his property into three sections by developing and recording a subdivision on its center portion. The record here does not demonstrate that a failure to value the property as one unit was not reflective of the market.

Even though the testimony of Mr. Solot as to his opinion of the value of the properties for ad valorem tax purposes should have been excluded, we do not find it necessary to reverse for two reasons. First, there is no showing the error was prejudicial since there was no testimony to show his value on a cash sale would have been lower than the value set by the State Board of Tax Appeals. Secondly, if there's sufficient legal and competent evidence in the record to sustain the findings and judgment, when the case is tried to the court without a jury, it will not be reversed for erroneous admission of evidence unless it affirmatively appears that the erroneous evidence affected the judgment of the trial court. *Murphy v. Yeast,* 59 Ariz. 281, 126 P.2d 313 (1942); *Anderson v. Alabam Freight Lines,* 64 Ariz. 313, 169 P.2d 865 (1946); *Anderson v. Artesia Inv. Co.,* 66 Ariz. 335, 188 P.2d 455 (1948). Without consideration of Mr. Solot's testimony there is ample evidence to sustain the judgment from another appraisal witness, Mr. Victor Thornton, the land supervisor of Pima County.

Affirmed.

RICHMOND, C. J., and HATHAWAY, J., concur.