599 P.2d 216

**Lloyd W. GOLDER and Esther B. Golder, husband and wife, Cimarron Properties Company, a partnership, A. W. Gibson and Eunice Gibson, husband and wife, Transamerica Title Insurance Company, Trust No. 6596, Catalina Foothills Estates, Inc., an Arizona Corporation, Barrick W. Groom, John G. Payson and Patricia Payson, husband and wife, Robert Snowden, as Trustee, and John W. Murphey, Trustee, Appellants,**

v.

**DEPARTMENT OF REVENUE, STATE BOARD OF TAX APPEALS, successor in interest to the State Board of Property Tax Appeals, Pima County Board of Supervisors, Pima County Assessor and Pima County Treasurer, Appellees.**

No. 13656–PR.

Supreme Court of Arizona, In Banc.

July 31, 1979.

Stubbs & Townsdin by Charles L. Townsdin, Jr., and Robert C. Stubbs, Tucson, for appellants.

Beer, Kalyna & Simon, by Olgerd W. Kalyna and Donald P. Roelke, Phoenix, for appellees.

HOLOHAN, Justice.

In this appeal nine property owners challenged the validity of the Pima County Assessor's valuation of their property for 1975. The nine taxpayers appealed individually pursuant to A.R.S. §§ 42–241.01 and 42–245. All nine then appealed to the Superior Court of Pima County pursuant to A.R.S. § 42–151. The nine appeals were consolidated for trial. The superior court found that the valuations of appellants' properties by the county assessor were not excessive. The taxpayers filed a timely appeal with the Court of Appeals, 123 Ariz. 271, 599 P.2d 227, and that court affirmed the trial court. Because of an apparent conflict between this decision and a previous opinion by the Court of Appeals, Division One, in *Burns v. Herberger,* 17 Ariz.App. 462, 498 P.2d 536 (1972), we granted the taxpayers' petition for review. We vacate the decision of the Court of Appeals and affirm the decision of the trial court.

Each of the nine appellants owns property in an area north of Tucson known as the Catalina Foothills. In 1974, the Pima County Assessor reassessed all of the rural and suburban lands within Pima County for the first time in several years. As a result of this reassessment, the taxable value of appellants' Catalina Foothills properties more than doubled. The county assessor found that sales of comparable real property indicated that the increased valuation of these properties was justified.

The assessor used the market data approach in valuing the properties, and assessed them at what he found to be current market values. Appellants estimated the taxable values of their properties to be sub-

stantially lower. They too used the market data approach. However, they applied a reduction formula intended to exclude amounts paid for "future anticipated property increments" as called for in A.R.S. § 42–123(A)(5).[1]

On appeal, the taxpayers raise three issues:

1) Did the trial court err in not using the reduction formula defined in 1969 by Director of the Arizona Department of Property Valuation and approved by the Court of Appeals in *Burns v. Herberger*?

2) Did the trial court err in refusing to strike expert testimony of property valuations based upon sales other than cash sales?

3) Did the trial court err in refusing to strike testimony of an expert wherein he assessed a large parcel of property in three separate pieces rather than as a whole?

I.

When a taxpayer appeals to superior court on the ground that the assessment of his property is "excessive," he bears the burden of overcoming the statutory presumption that valuation by the assessing authority is correct. A.R.S. § 42–152(B).[2] This he must do by presenting competent evidence. Where the taxpayer presents evidence based upon different methods of assessment than those used by the state, that evidence is not competent unless the taxpayer can demonstrate that the appraisal methods used are appropriate in the given circumstances. *Graham County v. Graham County Electric Co-op., Inc.,* 109 Ariz. 468, 512 P.2d 11 (1973).

1. A.R.S. § 42–123(A)(5): "Adopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation thereof. In the standard appraisal methods and techniques adopted current usage shall be included in the formula for reaching a determination of full cash value and when the methods and techniques adopted prescribe the use of

market data as an indication of market value, the price paid for future anticipated property value increments shall be excluded."

2. A.R.S. § 42–152(B): "At the hearing both parties may present evidence of any matters that relate to the classification or to the full cash value of the property in question as of the date of its assessment. The valuation or classification as approved by the appropriate state or county authority shall be presumed to be correct and lawful." ·

In 1969, Arlo Woolery was director of what was then known as the Arizona Department of Property Valuation. At that time he circulated a memorandum to the county assessors of all the counties in Arizona. This memorandum, hereinafter referred to as the "Woolery memorandum," outlined a procedure for assessing the value of undeveloped real estate held for speculation. The procedure began with the use of sales data gathered by the assessor from sales of comparable land. This information would give the assessor an estimate of the current market value of the property. The memorandum then instructed the assessor to calculate the "absorption rate" of the property in question. This figure, expressed in years, indicates the amount of time required for the market to fully absorb and develop the property in question. Then, using this figure, the assessor was to discount the current market value of the property by applying the appropriate percentage found in the Inwood reversion tables. (These tables are designed to calculate the present value of a dollar amount to be received at a given future date.) The assumption behind the procedure outlined in the Woolery memorandum was that property purchased today to be held for use at a later date had no current use, and that the holder would do nothing with the property but wait until the market was ready to absorb it.

From the inception of this case, appellants have clung to the assessment proce-dure spelled out in the so-called "Woolery memorandum." As its own author has testified, that procedure is incorrect. A careful examination of the memorandum shows that application of the Inwood reversion tables as proposed by Mr. Woolery at that time is an inappropriate use of these tables.[3] No case law exists, nor any logic which would support the perpetuation of faulty administrative proceedings merely for the sake of uniformity.

This court in *Industrial Commission v. Harbor Insurance Company*, 104 Ariz. 73, 449 P.2d 1 (1968) stated:

> "We have held many times that the construction placed on a statute by the executive body which administers it, if acquiesced in for a long period of time, will not be disturbed *unless such construction is manifestly erroneous*." 104 Ariz. at 76, 449 P.2d at 4. (Emphasis added.)

The procedure outlined in the "Woolery memorandum" was manifestly erroneous.

■ It is true that at the time the "Woolery memorandum" was in effect, it was given judicial approval by the Court of Appeals, Division One, in *Burns v. Herberger, supra*. In *Burns v. Herberger*, however, the issue facing the court involved the meaning of the term "current use." Neither party challenged the validity of using Inwood tables to calculate the "price paid for future anticipated property value increments." Rather, the taxpayer contended that the

---

3. Applying the Inwood tables to the future *anticipated* selling price of the property, using the absorption rate calculated by appellant's experts, would give an indication of what the *current* market price *should* be. Applying the tables to the *current* market price of the land, as appellant proposes, merely gives an estimate of what the property would have been worth to a speculator some years *in the past*. This figure has no meaning in the application of standard assessment procedures, nor is it an appropriate measure of "the price paid for future anticipated property value increments." An excerpt from defendant Department of Revenue's post-trial memorandum, at page 20, explains how and when use of Inwood tables might be appropriate:

"In the present case the highest and best uses of subject vacant properties are residen-tial use, and, in some instances, commercial use. Their current use is that of being held for investment and development purposes. The impact of A.R.S. §§ 201(3) & (4) and 123(A)(5) upon the evaluation of these properties is to prevent them from being valued upon sales data which reflect future use (i. e. residential lot sales and commercial lot sales in the area). These statutes do not prohibit their evaluation based upon sales data which reflect their current use (i. e. sales of other similar pieces of vacant land). Only when the subject properties are being valued based upon sales data which reflect future use are the use of the 'Inwood tables,' to determine the present worth of a future sales price, authorized or proper."

taxing authorities, by using a market data approach in assessing his property and a use approach in assessing surrounding property, discriminated against him in violation of the Constitution of Arizona, Art. IX, § 1, 17 Ariz.App. at 468, 498 P.2d at 542. In the course of discussing the issues, the Court of Appeals, Division One, described the procedure then used by the Department of Property Valuation (the procedure defined by the "Woolery memorandum") in the context of its discussion of the constitutional question.[4] Having examined this procedure carefully, we find that it is not mandated by A.R.S. § 42–123(A)(5). To the extent that *Burns v. Herberger* holds otherwise, it is hereby overruled.

In support of their interpretation of A.R.S. § 42–123(A)(5), appellants presented the testimony of two persons who had testified before a legislative committee regarding the provision. Appellee contends that this evidence should have been excluded.

 The rule is clearly established in Arizona that one member of a legislature which passes a law is not competent to testify regarding the intent of the legislature in passing that law. *Barlow v. Jones*, 37 Ariz. 396, 294 P. 1106 (1930); *State Tax Commission v. Marcus J. Lawrence Memorial Hospital*, 14 Ariz.App. 554, 557, 485 P.2d 277, 280 (1971); *Tucson Gas and Electric Company v. Schantz*, 5 Ariz.App. 511, 514–515, 428 P.2d 686, 689–690 (1967). "The intent of the Legislature can only be determined by the language used, aided by the canons and rules of construction founded upon reason and experience." *Barlow v. Jones*, 37 Ariz. at 399, 294 P. at 1107. The same logic which prevents one legislator from putting a gloss upon the meaning of a statute based only upon his own individual feelings also prevents a lobbyist or other

interested party from doing the same. The testimony of the witnesses Arnold and Killian regarding the intent of the legislature in passing A.R.S. § 42–123 was clearly incompetent, and must be disregarded in interpreting the meaning of that provision.

 What then does the term "future anticipated property value increments" mean? In attempting to resolve this question, appellant cites the maxim that a court should not interpret the language of a statute so as to render it meaningless, but it is equally basic that the words of a statute must be construed in conjunction with the full text of the statute. A.R.S. § 42–123(A)(5) requires that current usage of the property shall be used to determine cash value. It further provides that if "market data" is the means used to determine market value, "the price paid for future anticipated property value increments shall be excluded." We believe that this is another way of saying that market data valuation must be limited to present usage.

 If land is being used for agricultural purposes in the middle of urban growth, the statute in question requires that it be appraised on the basis of current usage. If a market data approach were used to appraise the land, the value of surrounding land would reflect the value for future housing or commercial use. This anticipated or future use may not be used in fixing a value for the land being used as a farm. The difference between market value and the value of the land for agricultural purposes represents that portion of the price which buyers would have to pay for "future anticipated property value increments." Since A.R.S. § 42–123(A)(5) requires that "current use" be considered in assessing the property, the agricultural user

4. The Court of Appeals stated, "The 'Inwood Tables,' used by the Department of Property Valuation, permit the present-day valuation of property, based upon sales data which reflects future use." This is a correct statement. What the court neglected to point out at that point was that sales data which reflect future use and sales data which indicate current market value are not equivalent concepts. Where the market information comes from sales of land already being developed, the prices paid are not an indication of current market value of property which will not be ready for development for a number of years. However, when the market information comes from sales of land still being held for speculation and at a stage of development comparable to the property being assessed, it is not future use which is reflected in the sales data but current value.

is taxed only to the extent that the land has value for agricultural purposes. The excess is excluded as the statute requires. However, when vacant land is being held solely for purposes of speculation, it makes no sense to refer to a *portion* of the market price as being paid for "future anticipated property value increments," since that is the speculator's *only* purpose in buying property. Were we to apply the language of the statute literally in this case, we would be required to exclude the entire market price, meaning that the speculator would pay no tax at all. Besides making a sham of the statute, such a calculation would totally ignore the mandate that "current use" be considered in assessing the property. Certainly the informed buyer purchasing vacant land for speculative purposes considers the land currently worth the entire price paid, and certainly the words "current use" can reasonably be interpreted to include holding for investment purposes.

## II.

Appellants contend that Mr. Solot, one of appellees' expert witnesses, should not have been allowed to testify regarding the cash value of the property in question because his opinions were not based upon cash sales, but rather upon sales involving extended payment terms.

A.R.S. § 42–152(B) allows both parties to present evidence of "any matters which relate to the classification or to the full cash value of the property in question as of the date of its assessment."

We agree with the appellants' contention that the term "full cash value" means the price that a willing buyer will pay to a willing seller in a *cash* transaction. A.R.S. § 42–201(4) provides that "full cash value" is synonymous with "market value," and A.R.S. § 42–227(A) requires that valuation of all taxable property be at market value. Thus, the county assessor is required to base his assessment on cash sales, or to make appropriate adjustments to market data where few cash sales occur.

However, the question before the trial court in deciding whether to strike Solot's testimony was not whether his opinions should have been based on cash sales, but rather whether they were relevant to the issue before the court.

Before the superior court may make an independent valuation of property, it must first determine that the county assessor's valuation is excessive. This finding is a condition precedent to the court's assumption of jurisdiction to make its own valuation. *Department of Property Valuation v. Trico Electric Co-operative, Inc.,* 113 Ariz. 68, 546 P.2d 804 (1976). The evidence which the court considers in deciding whether the valuation was excessive *may* also be a part of the evidence which the court uses to determine full cash value. *Department of Property Valuation v. Trico Electric Co-operative, Inc., supra; Graham County v. Graham County Electric Coop., Inc., supra.* Because Solot failed to make proper adjustments for noncash sales, his testimony would not be competent evidence for the court to consider in establishing a value for the properties in question, but it might well shed some light on the preliminary question before the court, i. e., whether the county assessor's valuation was excessive. The test of relevance in this situation is stated by McCormick and restated by Udall:

"[T]he most acceptable test of relevancy is the question, does the evidence offered render the desired inference more probable than it would be without the evidence?" Udall, Arizona Law of Evidence, § 111 at 207.

Udall points out that courts often confuse the question of relevancy with rules governing the sufficiency of evidence to sustain a finding. Solot's testimony would probably not be sufficient in and of itself to support the trial court's finding. But this does not mean that it is not relevant. As long as it has some probative value the trial court may consider it.

In *Viliborghi v. Prescott School District No. 1,* 55 Ariz. 230, 100 P.2d 178 (1940) this court reviewed the sufficiency of evidence presented in a condemnation case. We

stated, "The trial court was at liberty, in arriving at its conclusions, to take into consideration not only the market value as fixed by the different witnesses, but the methods they used in arriving at that value, and give such weight to each of the factors as it deemed proper." 55 Ariz. at 234, 100 P.2d at 180. In the instant case the trial court was well aware of the fact that Mr. Solot did not use cash sales in making his appraisals of the properties in question. The court also heard him explain that, had he used cash sales, his appraisals might well have been lower. Appellant's cross-examination brought out the weaknesses in Mr. Solot's appraisal techniques with all the emphasis the court would need to put his valuations in their proper perspective. The court did not err in refusing to strike Solot's testimony.

### III.

 Finally, appellants contend that the trial court erred in failing to strike Mr. Solot's testimony regarding the value of the Hvidsten property, because Solot valued it as several smaller parcels rather than one large parcel. The evidence presented to the trial court indicated that the Hvidsten property had been partially platted for subdivision. This fact alone would justify the county assessor in dividing the property into several parcels for assessment purposes.

A.R.S. § 42–229 does not by its language require the assessment of the Hvidsten property as one large parcel. Appellants cite no authority which would justify the court's twisting the language of the statute to change the word "may" into a binding mandate upon the county assessor.

The judgment of the trial court denying relief to appellant property owners is affirmed.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HAYS and GORDON, JJ., concur.