751 P.2d 552

**STEWART TITLE & TRUST OF TUCSON, an Arizona corporation, as Trustee under that certain trust known as Trust No. 2969; Hughes 523 Associates, an Arizona joint venture; and Nationwide Resources Corporation, an Arizona corporation, Plaintiffs/Appellees,**

**v.**

**PIMA COUNTY, a body politic; the State of Arizona, and Arizona Department of Revenue, Defendants/Appellants.**

No. 2 CA–CV 87–0104.

Court of Appeals of Arizona,
Division 2, Department A.

Oct. 20, 1987.

Review Denied March 30, 1988.

O'Connell, Wezelman, Poston & Bossé, P.C. by Steven L. Bossé and James D. Wezelman, Tucson, for plaintiffs/appellees.

Stephen D. Neely, Pima Co. Atty. by Peter E. Pearman, Tucson, Robert K. Corbin, Atty. Gen. by Michael G. Prost, Phoenix, for defendants/appellants.

## OPINION

HOWARD, Presiding Judge.

This appeal is from the judgment of the superior court, following a trial de novo, reversing the decision of the state board of tax appeals. The board had affirmed the Pima County Assessor's decision reclassifying appellees' property as class four non-agricultural, with a valuation of $2,227,260 for 1985. The trial court held that the property was properly classified as agricultural, with a value of $3,455. The appellants concede that the latter valuation is correct if the property is classified as agricultural. The question to be resolved is the proper classification of the property.

The superior court trial was held de novo pursuant to A.R.S. § 42–178. That authority to conduct de novo review of the board's decision is broad, and if the trial court concludes from competent evidence that the classification is erroneous, it must determine the correct classification. A.R.S. § 42–178(C). Similarly, if the court finds that the statutory presumption of correctness has been overcome and the valuation is excessive, it may proceed to find a new cash value. *Inspiration Consolidated Copper Co. v. Arizona Department of Revenue*, 147 Ariz. 216, 709 P.2d 573 (App. 1985). The trial court's findings will not be set aside unless clearly erroneous. *Whittemore v. Amator*, 148 Ariz. 173, 713 P.2d 1231 (1986).

## CLASSIFICATION OF REAL PROPERTY

Under the Arizona property tax statutes, county assessors are required to determine as of January 1 of each year the full cash value of all properties within their respective jurisdictions. A.R.S. § 42–221. Assessed valuation, against which the tax rate is applied to determine the amount of taxes owed, is a percentage of full cash value, and that percentage is determined

by the property's classification. A.R.S. § 42–227. In this case, all parties agree that the property should be given a class four designation, with a resulting assessed valuation of 16 percent of full cash value. The designation of the property within that class as either agricultural or non-agricultural determines the method by which full cash value is calculated, and thus drastically affects the amount of taxes to be paid.

A.R.S. § 42–141(A)(5)[1] requires the Department of Revenue (hereinafter "Department") to:

"[a]dopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation of such property. In the standard appraisal methods and techniques adopted, current usage shall be included in the formula for reaching a determination of full cash value. When the methods and techniques adopted prescribe the use of market data as an indication of market value, the price paid for future anticipated property value increments ... shall be excluded. *Land used for agricultural purposes shall be valued using solely the income approach to value without any allowance for urban or market influences. The income of the property shall be determined using the capitalized average annual net cash rental for such property. For the purpose of this paragraph, the average annual net cash rental for such property means the average of the annual net cash rental, excluding real estate and sales taxes, determined through an analysis of typical arm's length rental agreements collected for a five year period prior to the year for which the valuation is being determined, for comparable agricultural land used for agri-*

*cultural purposes and located in the vicinity, if practicable, of the property being valued. For the purpose of this paragraph, the average annual net cash rental shall be capitalized at a rate one and one-half percentage points higher than the average long-term annual effective interest rate for all new federal land bank loans for the five year period prior to the year for which the valuation is being determined."*

The italicized portion of the statute was added by the legislature in 1980. Laws 1980, 2d S.S., Ch. 8, § 39.

## DEPARTMENTAL GUIDELINES

Pursuant to § 42–141(A)(5), the Department has prepared guidelines for use by county assessors in determining whether land should be classified as agricultural. Division of Property and Special Taxes, Arizona Department of Revenue, Agricultural Manual No. 1532 (September 1983) (hereinafter "Manual"). The Manual, which was admitted into evidence, provides in pertinent part:

"Agricultural property is that real and personal property used for the purpose of agronomy, horticulture or animal husbandry:

1. In which the primary function is to produce an agricultural crop or commodity.

2. In which the improvements are primarily oriented to agricultural functions or agricultural support functions; ...

3. In which the total operation consists of at least the minimum number of acres or animal units specified in pages 205 through 208 ...

4. Which is used with a reasonable expectation of profit solely from its agricultural use." Manual at 101.

The Manual then defines non-qualifying rural property:

"Applying the preceding criteria for defining agricultural property, certain properties which have an appearance of

---

1. As a result of various legislative amendments not pertinent to this appeal, this subsection was originally codified in § 42–123(A)(5) and then § 42–123.01(A)(5). For ease of reference, we will use the current statutory designation.

agricultural use are considered non-qualifying farms or ranches for ad valorem property tax purposes. Two common non-qualifying types of property are:

1. Property used primarily for residential, pleasure, development speculative or recreational purposes. This type of property is classified and valued according to its primary use.

2. Property changing from agricultural use to non-agricultural use. Signs of such change include the appearance of survey stakes in conjunction with non-agricultural development, recording of a plat or plats, earthwork in connection with urban development, appearance of roads, installation of utilities, failure to plant crops despite the availability of adequate water, etc." (citations omitted). Manual at 102–103.

In order for property to qualify within this classification as ranch property, the guidelines provide that "its primary use must be livestock grazing on large uncultivated acreages utilizing natural forage crops." Manual at 203. Further, where privately owned undeveloped land is leased to a livestock rancher, the lease "must be critically analyzed to determine the valid qualifications of the land for classification as grazing ... land." Manual. The Manual requires that the analysis consider the following questions:

"1. Does the leased acreage add significant value to the farming or grazing capability of the farm or ranch?

2. Is there an operating well or water tank on the leased land?

3. Does the leased land create access between two parcels necessary for the operation of the farm or ranch?

4. Does the lessee's operation qualify as a farming or ranching operation?

5. Has the leased land consistently been leased for farming or grazing purposes?

6. Is the lease typical of other private farming or grazing leases in the state?

a. Is there sufficient evidence to prove that the lease is valid?

b. Are the terms and conditions of the lease reasonable?

c. Is the rental return in line with typical leases in the farming or ranching field?

7. If the leased acreage has been purchased recently, does the rental rate indicate a reasonable return on invested capital to the owner?" (citations omitted). Manual at 203–204.

### FACTUAL BACKGROUND

The property which is the subject of this appeal consists of approximately 636 acres of land, comprising all of Section 35, T15S, R14E, G & SRM, Pima County, Arizona. The trial court found, with ample support in the record, that this property, in conjunction with other leased and fee-owned lands, has been part of a continuous ranching operation since the turn of the century. For the past 18 years, it has been leased for grazing as part of the Franco Ranch, which consists of some 50 sections of leased land and is operated by Frank Rees. Prior to appellee Nationwide Resources Corporation's purchase of Section 35, the land had been leased to Rees by appellee's predecessor in interest, Pima Service Corporation, for a term expiring October 31, 1985. Although the lease was assigned to Nationwide as part of the purchase agreement, the latter entered into its own lease with Rees sometime in early 1985 for a term to expire on November 9, 1987.

Prior to 1983, none of the land within the Franco Ranch owned by Nationwide's predecessors in interest was classified as agricultural. At that time, the current owner appealed the assessor's classification and, after lengthy proceedings, a settlement was reached which provided that portions of the ranch would retain their non-agricultural status and other portions, including this section, would be classified as agricultural. Section 35 retained this classification for 1984.

In August of 1984, Nationwide purchased Section 35 from Pima Service Corporation for approximately $4,500,000. Harold Freedman, vice president of Nationwide, testified candidly that the property was purchased for investment. The property was conveyed, shortly after its pur-

chase, to two limited partnerships, then to a general partnership, then to a land trust in which Freedman and his brother held a beneficial interest, with the goal of selling the property to a developer within three years after its initial purchase. As part of the purchase agreement, Nationwide agreed to contribute $200,000 toward the construction of a paved road along one side of Section 35 in order to give the seller, Pima Service Corporation, access to four parcels which it owned to the south of Section 35.

According to the testimony of Bob Barry, supervisor of the land appraisal section of the Pima County Assessor's Office, this transaction and the affidavit of value recorded as a consequence triggered a review by his office of the property's classification. Despite the contentions of the appellants, it appears that this transaction was the principal reason for the change in classification. Barry testified that when Pima Service Corporation sold its four sections in the Franco Ranch located south of Section 35 during the prior year, once he concluded (erroneously) that there was a continuous thread of ownership—i.e., that it appeared that one of the sellers had retained a 5% beneficial interest in the property—he investigated no further and did not change the property's agricultural classification. In this case, even though the nature and use of the property were essentially the same as the other four sections, he determined that the property was being held for development or speculation and changed the classification accordingly.

Following a trial to the court, the trial court made numerous findings of fact in support of its determination that the appellants' classification of the property was erroneous. In particular, the court found that the sale of the property to Nationwide was the reason for the change in classification, that the property was within the definition of agricultural property set forth in the Manual, and that the present lease and the property met the first six criteria for classification as grazing land set forth above. No finding was made as to the seventh criterion, that is, the adequacy of the rate of return on the owner's investment in the property.

## ISSUES ON APPEAL

On appeal, appellants contend that the evidence does not support the trial court's findings and conclusions. They summarize the statutes, guidelines and case law as requiring inquiry into three main areas in determining classification: (1) the intent of the owner in purchasing the property; (2) the economic feasibility of using the property for agricultural purposes; and (3) the historical use of the land in question. They argue that the evidence requires the conclusion that appellees and their property fail in every area. We address their contentions in reverse order.

### 1. Historical Use of the Property.

■ Appellants contend that the fact that the property has been used for grazing for many years is not determinative, that the court erred in failing to consider the fact that the property was not classified agricultural until 1983 and that much non-agricultural development had occurred around the property within the Franco Ranch. We cannot agree with the appellants' characterization of the significance of these facts. A.R.S. § 42–141(A)(5) requires that property be valued with reference to its "current usage," which is defined in § 42–201(3) as "the use to which property is put at the time of valuation by the assessor or the department." So long as the owner can establish that the use of his property otherwise meets the definition of agricultural property, the fact that the property was previously given a different classification or surrounding property is put to other uses is of little significance. To the extent that historical use is a significant factor to be considered in determining the appropriate classification, the evidence was substantial and largely uncontradicted that the property had been used since the early 1900's as part of a ranching operation.

### 2. Economic Feasibility of Use for Agricultural Purposes.

■ As to the economic feasibility of using the property for agricultural pur-

poses, appellants argue that (1) the $250 annual rental under the grazing lease was not a reasonable rate of return on appellees' investment; (2) there was no evidence to show that the Franco Ranch was an economically viable operation; and (3) the property did not add significant grazing capacity to the ranch. The second contention is clearly contrary to the evidence. Robert Barry himself conceded that the ranch was at least a marginally viable operation.

As to the third point, the evidence was that the property could carry five to seven head of cattle, depending on the amount of rainfall. Under the Department's criteria, a property must have a minimum carrying capacity of 40 animal units to qualify as agricultural. Manual at 208. However, we believe that this criterion is directed toward the size of the entire ranch operation, rather than individual portions.

While it may be appropriate to consider how much a particular parcel adds to a ranching operation's overall capacity where that parcel is leased for the first time to an ongoing ranch and has not been previously classified as agricultural, it would not appear to have a great deal of significance where the parcel has been part of the ranch operation over a long period of time and the subject of a long-term leasing arrangement, as in the present case. The purpose of the guidelines is to assist the assessor in determining the bona fides of the lease upon which the owner bases his claim that the property should be classified as agricultural. Where the evidence establishes that the leased property has historically been and continues to be part of a viable, ongoing ranching operation and the carrying capacity of the property is the same or similar to the other portions of the ranch, this one factor should not be determinative.

The issue of rate of return on investment relates to the seventh factor in the Department's criteria for reviewing lands subject to grazing leases, and is the one factor which is not addressed in the trial court's findings. No contention is made that the rental rate is not typical of such grazing leases, and the evidence supports the finding of the trial court that it is. Further, Robert Barry agreed that, as urban areas encroach on ranch land, it will become difficult, if not impossible, to find a sale of property where the income from continued ranching operations will constitute a reasonable rate of return on the sales price. As noted above, we believe that the purpose of the guidelines is to assist in determining whether the lease transaction is merely a sham, or whether the property is in fact being used as part of a bona fide ranching enterprise. If all other criteria are met, we do not believe this factor alone may validly preclude agricultural classification. As discussed below, a denial of agricultural classification based on this factor alone is contrary to § 42–141(A)(5).

*Sherrill and LaFollette v. County of Mohave*, 22 Ariz.App. 606, 529 P.2d 1200 (1975), relied on by appellants, is distinguishable. Although the court concluded that the lease in that case did not represent a reasonable return on the taxpayer's investment, this was not the sole factor relied upon by the court. The property in *Sherrill* had no prior history of grazing use. The land had been purchased by the taxpayer for cotton farming, and was leased for grazing only when that was found to be infeasible and while the taxpayer was engaged in developing the property for subdivision. Further, the amount paid on the lease was less than that paid to other lessors by the rancher.

3. *Intent of the Owner in Purchasing the Property.*

Appellants' principal contention in this appeal is that the appellees purchased Section 35 primarily, if not exclusively, for investment purposes, and that under the Department's guidelines, this precludes its classification as agricultural, relying on *Sherrill,* and *Golder v. Department of Revenue, State Board of Tax Appeals,* 123 Ariz. 260, 599 P.2d 216 (1979). In *Sherrill,* Division One of this court implicitly held what the supreme court made plain in *Golder,* that is, that "current usage" within the meaning of A.R.S. § 42–141(A)(5) may include holding land for investment purposes. Citing also the Manual's defini-

tion of non-qualifying rural property, quoted above, the appellants contend that the evidence does not support the trial court's invalidation of the assessor's classification of Section 35 as non-agricultural class four property.

Appellees argue that *Golder* and *Sherrill* were in essence legislatively overruled by the 1980 amendment to A.R.S. § 42–141(A)(5). They reason that the legislature, by prescribing that "[l] and used for agricultural purposes shall be valued using solely the income approach to value without any allowance for urban or market influences," intended to preclude the appellants from considering either intended use or future use in determining the value of such property. Appellants respond that the amendment was intended to simply create a uniform method of valuing agricultural property, and not to limit the power to classify land as agricultural or non-agricultural.

The history of this subsection, prior to the 1980 amendment, was the subject of extended discussion in *Burns v. Herberger*, 17 Ariz.App. 462, 498 P.2d 536 (1972), overruled on other grounds by *Golder v. Department of Revenue, State Board of Tax Appeals*, 123 Ariz. 260, 599 P.2d 216 (1979). The court noted the assessors' use of their individual systems of property classification prior to 1963, which were struck down in *Southern Pacific Co. v. Cochise County*, 92 Ariz. 395, 377 P.2d 770 (1963). The legislature responded by enacting Article 2.1 of Title 42, authorizing the establishment by the Department of various property classifications to be applied uniformly throughout the state. Laws 1963, Ch. 43, § 1; *see now* A.R.S. § 42–162. However, the legislature made no change in the requirement that all property be valued at its "full cash value" based on its "highest and best use." The practical result for agricultural property was a tremendous increase in real property taxes because of the lower rate of return on investment in such property:

"To then value agricultural land which may in fact have as its 'highest and best use' a non-agricultural commercial use, at a fair market value based upon the market data derived from sales of other non-agricultural commercial property could result in a confiscatory tax because of the low profit margin traditional to this type of land." 17 Ariz.App. at 466, 498 P.2d at 540.

The legislature then amended the predecessor to § 42–141(A)(5) to insert the requirement that "current usage shall be included in the formula for reaching a determination of full cash value ..." and adopted the definition of "current usage" quoted above. The *Burns* court analyzed the effect of these amendments as follows:

"From our review of the past taxation history and the setting in which this legislation was enacted, we are of the opinion that this legislation had the effect of redefining 'full cash value' so that the Department of Property Valuation would have specific directions as to the fundamental principles to be applied in making appraisals. Under these principles, all property subject to *ad valorem* taxation was to be appraised at its fair market value, considering not its 'highest and best use,' but the current usage to which it was being placed. To not recognize this consideration is to ignore the legislative mandate that 'current usage shall be included in the formula for reaching a determination of full cash value,' ... and to reinstate the 'highest or best use' concept previously inherent in determining fair market value." 17 Ariz.App. at 467, 498 P.2d at 541.

The 1980 amendment of this same subsection is clearly aimed at giving further protection to property used for agricultural purposes by specifying the particular method to be used in appraising such property. It is this difference in appraisal methods that accounts for the great disparity in valuation of Section 35 by the appellants ($2,227,260) and the appellees ($3,455). While the appellants argue that this was the sole purpose of the amendment, we do not believe that it can be interpreted as merely a limitation on appraisal methods. To adopt the construction urged by the appellants would mean that land which is put to agricultural use through a bona fide

lease may nevertheless be classified as non-agricultural and subjected to a substantially higher property tax based on its value for non-agricultural purposes as reflected in its most recent sales price or the market value for similar non-agricultural land.

We note that the amendment specifies that, for purposes of determining income, the Department is to use the capitalized average annual net cash rental for such property, thus implicitly acknowledging that the majority of lands used in farming and ranching are leased lands, as in this case. The amendment's prohibition against consideration of urban or market influences is a recognition of the evidence presented in this case: that as metropolitan areas expand into rural areas, land becomes increasingly and substantially more valuable for commercial, industrial and residential development uses than for agriculture. Although the appellants concede that the purpose of the amendment was "to provide some protection to long time farmers and ranchers from an increasing tax burden resulting from increasing values of property as the result of the urbanization of an area," their interpretation would produce the opposite result. Fee-owned farm and ranch lands adjacent to urban areas would retain their agricultural status, but land leased for such purposes would be reclassified and subjected to substantially higher taxes. The owners of such lands would either pass the taxes on to the farmer or rancher, or proceed with development of the land for other, more profitable purposes. Thus, appellants' construction would deprive farmers and ranchers of the very protection they concede was intended by the legislature in adopting the 1980 amendment. Such a construction would effectively reinstate the concept of "highest or best use" rather than "current usage" as the basis for determining the value of such property, which is clearly contrary to both the intent of the legislature and the court in *Burns v. Herberger*, supra.

■ We believe that the intent of the legislature in enacting the 1980 amendment to § 42–141(A)(5) was to reinforce the concept of current usage in determining valuation with respect to property used for agricultural purposes. Under this interpretation, leased land which otherwise meets the Department's guidelines for agricultural property—specifically, the first six criteria for agricultural leases set forth in the Manual at 203–204—must be given that classification and valued using solely the income approach set forth in the statute, notwithstanding the fact that the owner intends ultimately to sell or develop the property for other purposes. To hold otherwise would render the amendment meaningless and ineffectual.

In the present case, the trial court found with ample support in the record that Section 35 and the grazing lease met the first six criteria in the Manual. In light of our interpretation of § 42–141(A)(5), the seventh criteria may not properly be considered because it is contrary to the intent of the 1980 amendment. Since Section 35 meets the appropriate criteria, the trial court was correct in holding that it should be classified as agricultural and valued at $3,455 for 1985.

In view of our holding, we deem it unnecessary to discuss appellees' contention that the reclassification of the subject property constituted a discriminatory practice by appellants, and therefore decline to address that issue.

## ATTORNEYS' FEES

■ Appellants contend that the trial court erred in awarding appellees attorneys' fees incurred during the administrative review of their tax appeal and in denying appellants' objections as to the reasonableness of certain other fees and expenses. They assert that the granting of attorneys' fees incurred while pursuing the administrative appeal process from the assessor to the state board of tax appeals appears to be based on A.R.S. § 12–348(H)(1), which provides:

"'Fees and other expenses' includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analy-

sis, engineering report, test or project which is found by the court to be necessary for the preparation of the party's case and reasonable and necessary attorney fees, and in the case of an action *to review an agency decision* pursuant to subsection A, paragraph 3 of this section, all such fees and other expenses incurred in the contested case proceedings in which the decision was rendered." (Emphasis added.)

Appellants argue that this section allows an award of fees and expenses for the administrative hearing only in those cases where the action is to review an agency decision pursuant to A.R.S. § 12–348(A)(3). They contend that the instant case is brought under A.R.S. § 12–348(A)(2), which relates to actions concerning the assessment or collection of taxes and, they argue, would not fall within the scope of the former subsection. A.R.S. § 12–348(A)(2) provides that attorneys' fees will be awarded in "[a] civil action brought by the party against the state, a city or town to challenge the assessment or collection of taxes." Thus, appellants argue, since A.R.S. § 12–348(H)(1) only refers to subsection (A)(3), and not (A)(2), it would appear that the court has no authority to award attorneys' fees incurred in the administrative appeal process.

Appellants acknowledge that their position is complicated by *Inspiration Consolidated Copper v. Arizona Department of Revenue, supra,* where the court held that both subsections (A)(2) and (A)(3) apply to property tax appeals, but contend that the court did not decide the case on the issue of statutory construction. They further submit that the legislature intended only an award of fees incurred in the judicial appeal and not in the administrative proceeding. They also note that the statutory property tax appellate procedure set forth in A.R.S. § 42–178(C) speaks only of granting the cost of the appeal to the prevailing taxpayer and does not allow an award incurred while appealing through the administrative appeal process.

We disagree and find the reasoning of the court in *Inspiration Consolidated* to be equally applicable to cases involving challenges to the Department's classification of property. We find no negative implication in the statute that would preclude an award of fees incurred during administrative appeals of property tax classifications and valuations. *New Pueblo Constructors, Inc. v. State,* 144 Ariz. 95, 696 P.2d 185 (1985), and *Cortaro Water Users' Ass'n v. Steiner,* 148 Ariz. 314, 714 P.2d 807 (1986), relied upon by the Department, are distinguishable. *New Pueblo* involved a common law contract action, not a judicial review of an agency decision within the meaning of A.R.S. § 12–348(A)(3). In *Cortaro,* the supreme court held that attorneys' fees incurred during the administrative proceedings were not recoverable because the agency in that case was acting in a quasi-judicial capacity, rather than exercising its "prosecutorial power." 148 Ariz. at 318, 714 P.2d at 811. The court emphasized that "[t]he dual functions of administrative agencies should be analyzed separately since agencies can operate statutorily both as prosecutors and adjudicators." *Id.* In the instant case, while "prosecutorial" may not be the appropriate adjective to describe the Department's role before the state board of tax appeals, it was adversarial and clearly not quasi-judicial. We note that the state board of tax appeals is an independent state agency not subject to the supervision or control of the department of revenue. A.R.S. § 42–141(A). The award of attorneys' fees incurred in the administrative proceedings was proper.

We also find without merit appellants' contention that appellees could have brought the action directly in superior court rather than pursuing the administrative appeal process and that the fees and expenses incurred in pursuing administrative appeals were unnecessary and should not have been awarded to appellees. Appellees had the "option" of either route, but we find no legitimate basis for penalizing them for the route chosen. Had they succeeded early in the administrative re-

view process, fees and expenses may have been minimized.

We find no basis for appellants' complaint that the fees were excessive, or that there was a duplication of effort which included the presence of two attorneys for appellees at trial. As appellees point out, one of the attorneys was more familiar with the facts of the case and the other's expertise was as a litigator. Appellees were entitled to the team effort of counsel. The attorneys' fees were adjusted downward from their usual rates to accommodate the statutory maximum for the award. We do not interpret A.R.S. § 12–348(D) to limit appellee to one attorney. Rather, we believe the statutory scheme authorizes the employment of a reasonable legal team within the statutory hourly strictures as provided in the statute. We find that the fees were reasonable and that the costs submitted were an appropriate "other expense."

Appellees seek a separate award of attorneys' fees in this appeal which they suggest be independently subject to the statutory limitation of $10,000 per award provided in A.R.S. § 12–348(D)(3). We agree. Moreover, the $10,000 limitation applies only to awards against the county, not the state. Appellees are awarded their fees and costs on appeal upon compliance with Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S.

The judgment is affirmed.

LACAGNINA, C.J., and FERNANDEZ, J., concur.