168 Ariz. 10 (1991)
810 P.2d 633
TITLE USA; W.P. Ritter Limited Partnership; Thomas Tait and Patricia Tait, husband and wife; Thomas Tait
v.
MARICOPA COUNTY; Arizona Department of Revenue. Kemper MARLEY and Ethel May Marley, husband and wife; Kemper Marley; Joyce Corrigan
v.
ARIZONA DEPARTMENT OF REVENUE; Maricopa County.
Nos. TX 88-00289, TX 89-00963.
Tax Court of Arizona.
April 30, 1991.
*11 Beus, Gilbert & Morrill by K. Layne Morrill, Phoenix, for plaintiffs-appellants Title USA, et al.
Attorney Gen. by Jack B. Schiffman, James D. Winter, and Michael F. Kempner, Phoenix, for defendant-appellee Arizona Dept. of Revenue.
Maricopa County Atty. Civ. Div. by Sandor O. Shuch and Sydney K. Davis, Phoenix, for defendant-appellee Maricopa County.
Fennemore Craig, P.C. by Paul J. Mooney, Phoenix, for plaintiffs-appellants Kemper Marley, et al.
OPINION
MORONEY, Judge.
The two cases under consideration in this Opinion are property tax appeals brought pursuant to A.R.S. § 42-177. In both *12 cases, the taxpayers challenge the taxing authority's refusal to classify the subject property as "used for agricultural purposes." Property "used for agricultural purposes" is valued for tax purposes by an income method defined in A.R.S. § 42-141(A)(5).[1] At the time these properties were valued for tax purposes, Arizona statutes did not provide a definition for "used for agricultural purposes."[2]
The taxing authority classified the property at issue in both cases as vacant land, and determined its value by the use of conventional appraisal techniques. Both properties are located near metropolitan areas in Maricopa County. The most significant element in the valuation of vacant land near metropolitan areas is its potential for ultimate urban development. Appraising such property by the use of conventional appraisal techniques will generate a valuation that is much higher than appraising the same property by the method set forth in A.R.S. § 42-141(A)(5).
The property in Title USA v. Maricopa County consists of approximately 150 acres across the Maricopa Freeway from Ahwatukee. The property is entirely within the city limits of Tempe. It is owned by various related entities. The person who represented the owners at trial, and the person whose farming effort defined the issue before the Court, was Tom Tait. In this Opinion, the Court will refer to the property which is the subject of the Title USA litigation as the Tait property, will refer to the person who directed the relevant activity on the property as Tait, and will refer to the litigation itself as the Tait case.
The property involved in Marley v. Arizona Department of Revenue consists of 13 sections in the City of Scottsdale between Pima Road and Fountain Hills, and between the extension of Bell Road and Deer Valley Drive. In this Opinion, this property will be referred to as the Marley property, and the litigation as the Marley case. The Marley property, on January 1, 1989, was owned by Kemper Marley, Sr., his wife, and his daughter. Mr. Marley died after this litigation was commenced. Prior to his death, he was the person who planned and directed the relevant activity on the Marley property. Afterward, such decisions were made by members of this family. Therefore, the Court will refer to the person who directed the relevant activity on the Marley property, whenever it occurred, as Marley.
The Tait case and the Marley case were tried to the Court in separate trials. The Court's decision in the Tait case was announced by minute order on February 2, 1990. The Court's decision in the Marley case is announced with this Opinion.
*13 The Court holds that the Tait property is not entitled to classification as being used for agricultural purposes. The Court further holds that a portion of the Marley property is entitled to such classification.
An Overview of the Relevant Law
In Arizona, all privately owned real property not exempted by the constitution or federal law is subject to ad valorem property taxation. Ariz. Const. Art. 9 § 2(6). Property taxes are levied against the property and not against the owner of the property. Read v. Arizona Dep't of Revenue, 166 Ariz. 533, 536, 803 P.2d 944, 947 (Tax 1991). Taxes are assessed and levied for each tax year with the status of the property being determined each year as of January 1. A.R.S. § 42-221(B). The starting point for determining how much tax is to be levied against a parcel of property is a determination as of January 1 of the "full cash value" of the property. A.R.S. § 42-221. Ordinarily, "full cash value" is equal to market value. The legislature has, however, prescribed the manner in which the full cash value of certain kinds of property will be ascertained. Where a specific method for valuing a particular kind of property is not prescribed, that property is valued at its market value using conventional appraisal techniques. A.R.S. § 42-201(4). Market value has been defined as the price at which a willing buyer will pay to a willing seller, neither of which is under any compulsion to buy or sell. State v. McDonald, 88 Ariz. 1, 352 P.2d 343 (1960).
As has been noted above, the legislature has provided that property "used for agricultural purposes" is to be valued as is set forth in A.R.S. § 42-141(A)(5). If such property is located in a metropolitan environment, and is valued at its market value as land with a potential for development, its value will be much greater than if it is valued as agricultural property using the income method prescribed in A.R.S. § 42-141(A)(5).
A.R.S. § 42-141(A)(5) also requires that the Department of Revenue shall "adopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation of such property." The Department of Revenue has published a document entitled "Department of Revenue Agricultural Manual No. 1532." A copy of revision number 4 of that manual, dated December 4, 1986, was introduced into evidence in the Tait case as exhibit 84 and in the Marley case as exhibit 102. In the manual, guidelines are set forth for use by county assessors to determine whether property should be classified as used for agricultural purposes.
The interpretation of the language of a statute is a function of the Court. If the language of the statute perspicuously manifests the legislative intent, no interpretation is necessary, as the statute speaks for itself. City of Mesa v. Killingsworth, 96 Ariz. 290, 394 P.2d 410 (1964)(en banc). If, as is the circumstance here, the statute does not provide sufficient definition to make clear how it should be applied, then the statute must be interpreted. In interpreting a statute, the goal of the court is to discern the legislative will. In doing so, the court should give great deference to the interpretation given the statute by an administrative agency charged with its implementation. Police Pension Board of City of Phoenix v. Warren, 97 Ariz. 180, 398 P.2d 892 (1965)(en banc).
Where administrative guidelines have been in use for a long time and reported opinions have cited them as authoritative, the court may presume that such guidelines represent the legislative intent with respect to the statutes which the guidelines interpret. Mummert v. Thunderbird Lanes, 107 Ariz. 244, 485 P.2d 814 (1971) (en banc); Long v. Dick, 87 Ariz. 25, 347 P.2d 581 (1959). Even so, the court is not bound by what the appurtenant agency has done or said, if such deed or word conflicts with the intention of the legislature as determined by the court. Miami *14 Copper Co. v. State Tax Comm'n, 121 Ariz. 150, 589 P.2d 24 (App. 1978).
Page 101 of the manual sets forth a four element criteria for agricultural property. 1) The primary use is to produce an agricultural crop or commodity. 2) The improvements are primarily oriented to agricultural functions. 3) Total operation consists of at least the minimum number of acres or animal units further defined in the guidelines. 4) The property is used with a reasonable expectation of profit solely from its agricultural use.
The statute requiring the Department to promulgate guidelines is not an unconstitutional delegation of the legislative function. Burns v. Herberger, 17 Ariz. App. 462, 498 P.2d 536 (App. 1972) overruled on other grounds, Golder v. Department of Revenue, 123 Ariz. 271, 599 P.2d 227 (App. 1978); Central Citrus Co. v. Department of Revenue, 157 Ariz. 562, 760 P.2d 562) (App. 1988). In Herberger, the Court of Appeals has provided an excellent overview of the evolution of the legislation which the Court is now compelled to interpret. Herberger cited what were then certain criteria set forth in the Department guidelines and specifically held the guidelines to be valid.
The parties do not dispute that the improvements, such as they are, on each of these properties, are primarily oriented to agricultural functions. Nor does the Department argue that either property is not of a size that is sufficient to meet the minimum number of acres or animal units required in the guidelines for agricultural classification. At issue in both cases are the criteria numbered 1 and 4 above.
Since Herberger, the list of qualifying criteria has changed. However, what are numbered 1 and 4 have been included in Department guidelines since Herberger. These two criteria have been cited as authoritative many times in subsequent reported cases. Sherrill & La Follette v. County of Mohave, 22 Ariz. App. 606, 529 P.2d 1200 (App. 1975); Stewart Title & Trust v. Pima County, 156 Ariz. 236, 751 P.2d 552 (App. 1988); Belle Vista Ranches v. Cochise County, 159 Ariz. 326, 767 P.2d 49 (App. 1988).
Based on the long use of these criteria and on their having often been relied on as authoritative in reported decisions, the Court holds that for either of the properties under discussion here to qualify as property used for agricultural purposes, such property must meet the following standards: its primary use must be to produce an agricultural crop or commodity; and the property must be used with a reasonable expectation of profit solely from its agricultural use.
Facts Established at Trial
In the Tait case, the taxpayers claim the property should be classified as used for agricultural purposes for the two tax years 1988 and 1989. The basis for this assertion is an attempt by Tait to grow barley on the property. The parties have stipulated that the full cash value of the property, if it were not to be classified as used for agricultural purposes, is approximately $9,500,000.00 for each of the two tax years under review. The parties have also stipulated that the full cash value of the property, if classified as used for agricultural purposes, would be less than $400,000.00 for either tax year. The difference in annual property taxes is something in the neighborhood of $140,000.00.
At the time of the events related here, Tom Tait had a long history of successful farming in Maricopa County. During the 16 years preceding trial, he had been responsible for farming between 350 to 1,200 acres a year. At the time of trial, his farming operations covered 800 acres. He had previous experience with cotton, wheat, alfalfa, and barley. He was without question a competent agronomist.
The Tait interests purchased the Tait property in 1973. At the time the property was purchased it was not being used as a farm, nor had it been so used for a considerable period of time. The property is located on the downward slope of South Mountain, and, itself, slopes from northwest to southeast. When there is a hard rain, water runoff comes from South *15 Mountain, through Ahwatukee, under the freeway, and flows over the property "in sheets."
Prior to 1986, the only effort made to improve the property was the casual movement of earth done to trap some of the run-off from heavy rains. Honey mesquite trees grew in the southeast portion of the property. Tait transplanted a number of these trees to other parts of the property, using the trapped water to irrigate them. Honey mesquite trees were donated by Tait into the Tempe community for use in parks and other public areas.
In 1986, Tait decided to produce a field crop on the property. The necessary clearing began in that year. However, the project proved to be more difficult than originally anticipated, and as a result, it was not until spring of 1988 that the land was made ready for planting.
In attempting to produce a field crop on the property, Tait was faced with a significant drawback. The property had no irrigation allotment. The crop to be produced, therefore, had to be dry farmed. Tait chose barley as the grain best suited for this venture. Relying on information obtained from the University of Arizona Department of Agriculture, Tait selected a type of barley developed for dry climates.
The delay in getting the land cleared prevented Tait from planting a barley crop in early 1988. The crop was finally planted in mid-October 1988, on the heels of a major storm. The crop was "sheeped" in mid-December providing revenue to Tait of $744.00.
"Sheeped" means that sheep were placed on the property and allowed to graze the barley crop. Sheeping is an accepted activity often done in late fall or early winter to minimize anticipated damage from frost. It also produces some revenue from the crop.
The barley crop regrew through the winter and was ultimately harvested in the spring. Overall, the crop did not do well. Tait suffered a loss of $4,000.00.
During the trial, evidence was presented that an unusual lack of rainfall in March, coupled with unusually high temperatures, devastated what otherwise would have been a remarkably successful project. There was also testimony that had Tait elected an alternate method of harvest (an earlier green chop), the crop would have proven profitable.
Barley is not a common crop in Maricopa County. Virtually all farmland in Maricopa County is irrigated. The cost of growing barley with irrigation makes such a use of irrigated land non-competitive with better money crops such as cotton and alfalfa. Barley is ideally dry farmed at altitudes of 4,000 feet or more, or in latitudes north of Arizona where the weather is cooler, and there is more rainfall. Prior to Tait's attempt in 1988, there had been a few isolated instances in Maricopa County where barley had been successfully grown with rain water. To have a successful barley crop without irrigation in Maricopa County, however, there must be greater than average rainfall, and it must fall at just the right times during the growing season. From the evidence presented at trial, the Court finds dry land barley farming in Maricopa County to be a most precarious undertaking.
Meanwhile, in north Scottsdale, a different sort of operation, albeit with a similar goal, was taking place. The principal operator of the Marley property was Kemper Marley, Sr. Like Tait, Marley had a long personal history in agriculture. Unlike Tait, however, Marley was a rancher, not a farmer. On January 1, 1989, Marley had been engaged in cattle ranching in Arizona for over 60 years.
The issue in Marley is the classification of the Marley property for the tax year 1989. The Board of Tax Appeals valued the property as vacant land at a bit over $94,000,000.00. Marley claims it should be valued as property used for agricultural purposes at approximately $100,000.00. What is at stake is a potential tax savings of over $750,000.00 for the tax year 1989.
The Marley property was what remained of the DC Ranch. Valuation of the DC Ranch was the subject of discussion in Burns v. Herberger, supra.
*16 No witness at trial had lived long enough to remember exactly the extent of the DC Ranch when Kemper Marley, Sr., first acquired an interest in it. One witness, an old family friend, testified that from 1949 to 1961 the DC Ranch extended from Scottsdale to Carefree, and from Scottsdale Road to the Verde River. In any case, it is clear that at one time in the not too distant past, the ranch covered a large territory, a territory much larger than it occupies today. See Burns v. Herberger, 17 Ariz. App. at 464, 498 P.2d at 538. In addition to fee land, like most Arizona ranches, the DC Ranch included land leased from the state and from the federal government.
Kemper Marley and E.E. Brown owned the DC Ranch as partners from some time before 1930 until Brown's death in the early 1950's. When Brown died, the ranch was divided, with Marley taking the south half and Brown's heirs the north half. Later, Kemper Marley, Sr., or related interests, obtained some of the fee land that was part of the north half of the ranch.
Through the years, urban development encroached on the ranch to the point where the property was no longer economically viable as a cattle ranch. Marley stopped running cattle on it some time in the 1970's. Later on, he was approached by the Etchamendy Brothers who wanted to graze sheep on the ranch for a short period of time in the spring of the year. The Etchamendys paid Marley for the right to graze sheep on the property in the years 1979 through 1985. Browse was so bad in 1982 and 1984, however, that sheep were not grazed west of the Verde in those years.
The Court finds that the Etchamendy lease was situational. Sheep grazing as was done by the Etchamendys was not such an agricultural use as would justify a conclusion that the primary function of the property was to produce an agricultural crop or commodity. In any case, from the evidence presented at trial, the Court finds that very little, if any, of the Etchamendy grazing took place on the Marley property. Most of the land actually grazed by Etchamendy sheep was west of Pima Road and south of the Marley property. The Court finds that long prior to December 1988, the Marley property had ceased being used for agricultural purposes. Cattle raising on the property did not make economic sense, and occasional seasonal grazing of sheep close by was not a sufficient use to justify an agricultural use classification.
Despite the property's change in use, the Maricopa County Assessor, with the approval of the Department of Revenue, continued to classify the property as agricultural. It became apparent in 1988 that that was about to change.
In December 1988, Marley decided to put goats on the property. The Court finds from the evidence presented at trial that, regardless of the factors which brought Marley to this decision, he intended to operate a successful goat ranch, raising the animals for meat.
There is a spring in the eastern part of the Marley property in the McDowell Mountains. Testimony at trial indicated that this spring produces 5 1/2 gallons per minute "year-round". The delivery of water was improved by Marley and Brown in the early 1920's. The spring was capped, and a cast-iron pipe was laid from the spring to a tank constructed west of what is now Pima Road. After Marley ceased running cattle on the ranch, the delivery system fell into disrepair. The spring still produced water, but the pipe was broken in many places and was no longer functional beyond a half-mile from the spring. In 1988, Marley repaired the water delivery system so that it would deliver water to a stock tank located a little over two miles west of the spring, near what was referred to during the trial as the goat camp. In the early days, the ranch headquarters had been located near the goat camp. Brown lived on the ranch at that location, but later moved the ranch headquarters some distance closer to Carefree. In December 1988, there were no permanent structures on the property.
A corral in the vicinity of the goat camp was repaired. In December 1988, Marley went to Texas and bought 500 goats. The *17 goats were shipped to Arizona, arriving at the property on December 8, 1988. From the viewpoint of the goats, the trip from Texas to Arizona proved to be stressful. Either as a result of bad weather on the road, disease, psychological trauma, or some other cause, an epidemic swept the goat herd shortly after it arrived in Arizona. By the time the murrain had run its course, the herd had been reduced by at least one-half. Thereafter, for some months, the size of the herd remained stable at around 250 goats.
For a time after their arrival, the goats were herded, but after they became acclimated to the terrain and knew where the water was, they were permitted to range free. And range free they apparently did. Testimony from members of the Marley family reflected goat sightings in every corner of the property and beyond. From the evidence offered at trial, the Court finds that the most efficient way to raise goats on the Marley property is by the use of fenced pastures through which goats are rotated periodically. Nevertheless, the free ranging of goats is an accepted method of raising goats for meat, if adequate browse and water is available.
Within six months after the goats arrived in Arizona, Marley's health failed and, after a long illness, he died shortly before trial. The Court finds from the evidence that, when he placed the goats on the property, Marley was qualified to conduct a goat ranching operation. Witnesses for the Department of Revenue challenged the management skill of Marley's successors, perhaps with some justification. Nevertheless, on January 1, 1989, the nascent goat ranch was right where such an operation would be expected to be.
The evidence at trial was overwhelming that the property contained adequate browse to support Marley's goat herd. The property is much better suited to goats than cows. Water delivery, however, was limited to the pipeline that ran from the spring to the goat camp.
While there was evidence that Marley's goats were a peripatetic lot, there was more persuasive testimony that goats ordinarily do not roam more than a mile from water, and that the foraged browse was concentrated in an area of approximately 750 acres near the goat camp.
The Court finds from the evidence presented that the lack of water makes parcels in the south and east portions of the property not suitable for the ranching of goats. The Court further finds that the proximity of Pima Road, and property development just east of Pima Road, makes western parcels of the property unsuitable for the unfenced ranging of livestock.
The Court's Decision
A.R.S. § 42-221(B) in 1988 read as follows:
Not later than November 30 each year the county assessor shall ascertain by diligent inquiry and examination all property in his county subject to taxation, and not otherwise provided by law to be valued by the department. He shall determine the names of all persons owning, claiming or having possession or control thereof and determine through the use of the manuals furnished and procedures prescribed by the department the full cash value of all such property, as of January 1 of the next year, and he shall list such property together with the valuation found for use on the roll.
The Court holds that this statute provides that the condition of the property on January 1 decides both its classification and valuation for the tax year beginning on that date. See Stewart Title & Trust v. Pima County, 156 Ariz. 236, 751 P.2d 552 (App. 1988). On January 1, 1988, the Tait property was not being used for agricultural purposes. Up to that time, no field crop had been grown on the property for at least as many years as the Tait interests had owned the property.
Tait argued at trial that clearing had commenced, and the property should be classified according to its intended use. In making this argument, Tait is relying on A.R.S. § 42-162(B). A.R.S. § 42-162(B) reads as follows: "For the purposes of classification of property under this section, partially completed or vacant improvements *18 shall be classified according to their intended use."
There appear to be a couple of flaws in the Tait analysis. First of all, the statute reads "for the purpose of classification of property under this section." "This section" is A.R.S. § 42-162. A.R.S. § 42-162 divides property into eight classes for taxation. A.R.S. § 42-162(B) is directed only at the process of categorizing property into one of the eight classes defined in A.R.S. § 42-162(A). The Tait property will be classified in class 4 whether it is classified as agricultural property or as vacant land. A.R.S. § 42-162(B) also refers to partially completed or vacant improvements, which the Court holds to be something other than clearing and leveling vacant land.
This is not to say that A.R.S. § 42-162(B) precludes classifying agricultural land for its intended use. It simply does not address the issue. Whether land being cleared for planting should be classified as agricultural depends upon whether or not the legislature so intended in the enactment of the relevant statutes. The Court holds that it did not.
From the numbers set out in this Opinion, it is clear that much is at stake. In both of these cases, the properties are located in a metropolitan environment, and the value of the properties for potential development is far greater than their value as agricultural property. The potential tax savings for both Tait and Marley are so substantial that it is foolish to think such benefits could be ignored when decisions regarding their property were being made. There is nothing in the applicable statutes, however, that suggests that otherwise valuable land cannot be classified as used for agricultural purposes. Stewart Title & Trust v. Pima County, supra, holds that land purchased for potential development can be so classified.
Because of the great potential for abuse, tests for determining whether property qualifies as used for agricultural purposes must be objective to the extent possible. The subjective intent to plant later or herd later is not enough, even if such intent is coupled with steps taken to make the property ready for the later intended agricultural use. It should be noted that in both the Tait case and the Marley case, the issue is the classification of property first used for agricultural purposes after a long absence of such activity. In such a case, the Court holds, that in order to justify a classification of land used for agricultural purposes, the crops must have been planted, or the livestock in place, by January 1 of the tax year. The Tait property, therefore, is not entitled to classification as agricultural property for the tax year 1988.
In ruling what must have been done by January 1 of the tax year, the Court does not disturb existing law with respect to land which, having been in recent production, is temporarily out of production because of drought, or because of the rotation of crops or pastures. These matters are considered in the Department's manual, and are not the subject of either of the cases before the Court.
The Court has held that property to be classified as used for agricultural purposes must meet two criteria set forth in the Department guidelines.[3] The property must have as its primary use to produce an agricultural crop or commodity, and the property must be used with a reasonable expectation of profit solely from its agricultural use.
It is the Department's position, in the Marley case at least, that the primary use of the property is for investment. The Court holds that the term "primary use" refers to the functional use to which the property is being put, and not to the owner's motive for acquiring it or for holding it. Stewart Title, supra. The Court holds that, in both of the cases under review, primary use of the property is agricultural. This ruling in the Marley case is subject to some modification as is set forth below.
*19 It is clear to the Court, from a review of the statutory scheme, that the legislature intended that property dedicated to a bona fide agricultural use was not to be subject to crippling taxes caused by rapid valuation increases engendered by speculation on future urban development. The Court is also convinced that the legislature did not intend to permit an agricultural use classification to speculators or developers who, seeking significant tax relief, use idle vacant land for something less than a bona fide agricultural activity. The determination of whether property should be classified as used for agricultural purposes cannot rest on the self-serving representations of an intent to grow crops or raise animals. A more objective standard must be found.
For property to meet the criteria for agricultural property it must be used for growing crops or for raising animals. Central Citrus Co. v. Arizona Dep't of Revenue, 157 Ariz. 562, 760 P.2d 562 (App. 1988). The departmental guidelines indicate, and the Court has held, that the property must be used with a reasonable expectation of profit solely from its agricultural use. At trial in Tait, the Department agreed that, in determining whether there is a reasonable expectation of profit, the cost of maintaining an investment in the land itself is not to be considered. See Stewart Title, 156 Ariz. at 241, 751 P.2d at 557. It is also clear that it is not necessary that agricultural activity produce a profit every year. The Court holds, however, that, considered in retrospect, such activity must produce reasonable profit in an average year.
In attempting to assess prospectively whether property first used in the subject year is used with a reasonable expectation of profit from its agricultural use, the Court holds that a two-element test must be applied. First, would a reasonably prudent farmer or rancher use the land as a farm or a ranch if the land were so far removed from an urban environment that it had no potential for development? Second, is the agricultural activity on the land conducted in conformance with generally accepted agricultural practices in use by successful farmers or ranchers? If both of these questions can be answered affirmatively, the property is entitled to an agricultural use classification.
The Court finds, from the evidence presented at trial, that dry land barley farming in Maricopa County, Arizona, is too precarious a venture to entice a reasonably prudent farmer to engage in it. The Court therefore holds, in the Tait case, that the 1988 and 1989 valuations of the Tait property are those values agreed to by the parties and set forth in paragraph 16 of the uncontested facts portion of the pretrial statement. These are values which do not recognize an agricultural use of the property.
In the Marley case, the Court finds from the evidence produced at trial, that a reasonably prudent goat rancher could and would utilize the Marley property for the commercial raising of goats for meat. The Court further finds that as of January 1, 1989, at least a portion of the Marley property was being used in conformance with generally accepted practices for raising goats.
In the Marley case, the Taxpayers have argued that, if any portion of the property is classified to an agricultural use, the entire property must be. No authority has been cited to the Court for this proposition. The Court holds that only those parcels which a reasonably prudent goat rancher would find to be necessary to make goat ranching an economic success, and which are actually utilized to that end, need be classified as agricultural property.
The Court has already indicated that, because of a lack of water delivery, fences, and forage, portions of the Marley property are not suitable for the goat ranching operation in place on the property on January 1, 1989. The Court finds from the evidence at trial that the parcels that comprise five sections surrounding the goat camp are necessary and suitable for the agricultural enterprise begun on the Marley *20 property in December 1988. These sections are identified and their valuation announced in a minute order of the Court entered April 10, 1991. The Court's minute order also announces the Court's finding with respect to the portions of the Marley property which are not entitled to an agricultural use classification.
NOTES
[1] A.R.S. § 42-141(A)(5) requires the Department of Revenue (hereinafter "Department") to:

"[a]dopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation of such property. In the standard appraisal methods and techniques adopted, current usage shall be included in the formula for reaching a determination of full cash value. When the methods and techniques adopted prescribe the use of market data as an indication of market value, the price paid for future anticipated property value increments ... shall be excluded. Land used for agricultural purposes shall be valued using solely the income approach to value without any allowance for urban or market influences. The income of the property shall be determined using the capitalized average annual net cash rental for such property. For the purpose of this paragraph, the average annual net cash rental for such property means the average of the annual net cash rental, excluding real estate and sales taxes, determined through an analysis of typical arm's length rental agreements collected for a five year period prior to the year for which the valuation is being determined, for comparable agricultural land used for agricultural purposes and located in the vicinity, if practicable, of the property being valued. For the purpose of this paragraph, the average annual net cash rental shall be capitalized at a rate one and one-half percentage points higher than the average long-term annual effective interest rate for all new federal land bank loans for the five year period prior to the year for which the valuation is being determined."
[2] In 1989, the Arizona legislature enacted A.R.S. § 42-167, which sets forth criteria for classification as property used for agricultural purposes. Laws 1989, Ch. 61 § 1.
[3] It may be that the property must meet more than two of the criteria set forth in the guidelines. Other criteria than the two cited, however, are not at issue in either of the cases under review, and so the Court does not address them.